# FIRST ENGLISH EVANGELICAL LUTHERAN CHURCH OF GLENDALE *v.* COUNTY OF LOS ANGELES, CALIFORNIA

No. 85–1199.　Argued January 14, 1987—Decided June 9, 1987

REHNQUIST, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, POWELL, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in Parts I and III of which BLACKMUN and O'CONNOR, JJ., joined, *post*, p. 322.

*Michael M. Berger* argued the cause for appellant. With him on the briefs was *Jerrold A. Fadem.*

*Jack R. White* argued the cause for appellee. With him on the brief were *DeWitt W. Clinton, Charles J. Moore,* and *Darlene B. Fischer.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case the California Court of Appeal held that a landowner who claims that his property has been "taken" by a land-use regulation may not recover damages for the time be-

*Briefs of *amici curiae* urging reversal were filed for the American College of Real Estate Lawyers by *Robert O. Hetlage, David A. Richards, Eugene J. Morris,* and *John P. Trevaskis, Jr.;* for the California Association of Realtors by *William M. Pfeiffer;* for the California Building Industry Association by *Gideon Kanner;* for the National Association of Home Builders by *Kenneth B. Bley* and *Gus Bauman;* for the National Association of Realtors by *William D. North;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Robert K. Best.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Ayer, Deputy Assistant Attorneys General Marzulla, Hookano,* and *Kmiec,* and *Edwin S. Kneedler* and *Peter R. Steenland, Jr.;* for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *Richard C. Jacobs, N. Gregory Taylor,* and *Theodora Berger,* Assistant Attorneys General, and *Craig C. Thompson* and *Richard M. Frank,* Deputy Attorneys General, joined by the Attorneys General for their respective States as follows: *Harold M. Brown* of Alaska, *John Steven Clark* of Arkansas, *Jim Smith* of Florida, *Corinne K. A. Watanabe* of Hawaii, *Neil F. Hartigan* of Illinois, *James E. Tierney* of Maine, *Francis X. Bellotti* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Edwin L. Pittman* of Mississippi, *William L. Webster* of Missouri, *Stephen E. Merrill* of New Hampshire, *Robert Abrams* of New York, *Nicholas J. Spaeth* of North Dakota, *Michael Turpin* of Oklahoma, *T. Travis Medlock* of South Carolina, *Mark V. Meierhenry* of South Dakota, *Jim Maddox* of Texas, *David L. Wilkinson* of Utah, *Jeffrey L. Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Kenneth O. Eikenberry* of Washington, *Archie G. McClintock* of Wyoming, and *Hector Rivera Cruz* of Puerto Rico; for the city of Los Angeles et al. by *Gary R. Netzer, Claudia McGee Henry,* and *Anthony Saul Alperin;* for the National Association of Counties et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin,* and *Beate Bloch;* and for the Conservation Foundation et al. by *Fred P. Bosselman* and *Elizabeth S. Merritt.*

fore it is finally determined that the regulation constitutes a "taking" of his property. We disagree, and conclude that in these circumstances the Fifth and Fourteenth Amendments to the United States Constitution would require compensation for that period.

In 1957, appellant First English Evangelical Lutheran Church purchased a 21-acre parcel of land in a canyon along the banks of the Middle Fork of Mill Creek in the Angeles National Forest. The Middle Fork is the natural drainage channel for a watershed area owned by the National Forest Service. Twelve of the acres owned by the church are flat land, and contained a dining hall, two bunkhouses, a caretaker's lodge, an outdoor chapel, and a footbridge across the creek. The church operated on the site a campground, known as "Lutherglen," as a retreat center and a recreational area for handicapped children.

In July 1977, a forest fire denuded the hills upstream from Lutherglen, destroying approximately 3,860 acres of the watershed area and creating a serious flood hazard. Such flooding occurred on February 9 and 10, 1978, when a storm dropped 11 inches of rain in the watershed. The runoff from the storm overflowed the banks of the Mill Creek, flooding Lutherglen and destroying its buildings.

In response to the flooding of the canyon, appellee County of Los Angeles adopted Interim Ordinance No. 11,855 in January 1979. The ordinance provided that "[a] person shall not construct, reconstruct, place or enlarge any building or structure, any portion of which is, or will be, located within the outer boundary lines of the interim flood protection area located in Mill Creek Canyon . . . ." App. to Juris. Statement A31. The ordinance was effective immediately because the county determined that it was "required for the immediate preservation of the public health and safety . . . ." Id., at A32. The interim flood protection area described by the ordinance included the flat areas on either side of Mill Creek on which Lutherglen had stood.

The church filed a complaint in the Superior Court of California a little more than a month after the ordinance was adopted. As subsequently amended, the complaint alleged two claims against the county and the Los Angeles County Flood Control District. The first alleged that the defendants were liable under Cal. Govt. Code Ann. § 835 (West 1980)[1] for dangerous conditions on their upstream properties that contributed to the flooding of Lutherglen. As a part of this claim, appellant also alleged that "Ordinance No. 11,855 denies [appellant] all use of Lutherglen." App. 12, 49. The second claim sought to recover from the Flood Control District in inverse condemnation and in tort for engaging in cloud seeding during the storm that flooded Lutherglen. Appellant sought damages under each count for loss of use of Lutherglen. The defendants moved to strike the portions of the complaint alleging that the county's ordinance denied all use of Lutherglen, on the view that the California Supreme Court's decision in *Agins* v. *Tiburon*, 24 Cal. 3d 266, 598 P. 2d 25 (1979), aff'd on other grounds, 447 U. S. 255 (1980), rendered the allegation "entirely immaterial and irrelevant[, with] no bearing upon any conceivable cause of action herein." App. 22. See Cal. Civ. Proc. Code Ann. § 436(a) (West Supp. 1987) ("The court may . . . [s]trike out any irrelevant, false, or improper matter inserted in any pleading").

In *Agins* v. *Tiburon, supra,* the California Supreme Court decided that a landowner may not maintain an inverse condemnation suit in the courts of that State based upon a "regulatory" taking. 24 Cal. 3d, at 275–277, 598 P. 2d, at 29–31. In the court's view, maintenance of such a suit would allow a landowner to force the legislature to exercise its power of eminent domain. Under this decision, then, compensation is not required until the challenged regulation or ordinance has been held excessive in an action for declaratory

---

[1] Section 835 of the California Government Code establishes conditions under which a public entity may be liable "for injury caused by a dangerous condition of its property. . . ."

relief or a writ of mandamus and the government has never-theless decided to continue the regulation in effect. Based on this decision, the trial court in the present case granted the motion to strike the allegation that the church had been denied all use of Lutherglen. It explained that "a careful re-reading of the *Agins* case persuades the Court that when an ordinance, even a non-zoning ordinance, deprives a person of the total use of his lands, his challenge to the ordinance is by way of declaratory relief or possibly mandamus." App. 26. Because the appellant alleged a regulatory taking and sought only damages, the allegation that the ordinance denied all use of Lutherglen was deemed irrelevant.[2]

On appeal, the California Court of Appeal read the com-plaint as one seeking "damages for the uncompensated taking of all use of Lutherglen by County Ordinance No. 11,855 . . . ." App. to Juris. Statement A13–A14. It too relied on the California Supreme Court's decision in *Agins* in rejecting the cause of action, declining appellant's invitation to reevalu-ate *Agins* in light of this Court's opinions in *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621 (1981). The court found itself obligated to follow *Agins* "because the United States Supreme Court has not yet ruled on the question of whether a state may constitutionally limit the remedy for a taking to nonmonetary relief . . . ." App. to Juris. State-ment A16. It accordingly affirmed the trial court's decision to strike the allegations concerning appellee's ordinance.[3] The California Supreme Court denied review.

---

[2] The trial court also granted defendants' motion for judgment on the pleadings on the second cause of action, based on cloud seeding. It limited trial on the first cause of action for damages under Cal. Govt. Code Ann. § 835 (West 1980), rejecting the inverse condemnation claim. At the close of plaintiff's evidence, the trial court granted a nonsuit on behalf of defend-ants, dismissing the entire complaint.

[3] The California Court of Appeal also affirmed the lower court's orders limiting the issues for trial on the first cause of action, granting a nonsuit on the issues that proceeded to trial, and dismissing the second cause of action—based on cloud seeding—to the extent it was founded on a theory

This appeal followed, and we noted probable jurisdiction. 478 U. S. 1003 (1986). Appellant asks us to hold that the California Supreme Court erred in *Agins* v. *Tiburon* in determining that the Fifth Amendment, as made applicable to the States through the Fourteenth Amendment, does not require compensation as a remedy for "temporary" regulatory takings—those regulatory takings which are ultimately invalidated by the courts.[4] Four times this decade, we have considered similar claims and have found ourselves for one reason or another unable to consider the merits of the *Agins* rule. See *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340 (1986); *Williamson County Regional Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172 (1985); *San Diego Gas & Electric Co.*, *supra*; *Agins* v. *Tiburon*, *supra*. For the reasons explained below, however, we find the constitutional claim properly presented in this case, and hold that

---

of strict liability in tort. The court reversed the trial court's ruling that the second cause of action could not be maintained against the Flood Control District under the theory of inverse condemnation. The case was remanded for further proceedings on this claim.

These circumstances alone, apart from the more particular issues presented in takings cases and discussed in the text, require us to consider whether the pending resolution of further liability questions deprives us of jurisdiction because we are not presented with a "final judgmen[t] or decre[e]" within the meaning of 28 U. S. C. § 1257. We think that this case is fairly characterized as one "in which the federal issue, finally decided by the highest court in the State [in which a decision could be had], will survive and require decision regardless of the outcome of future state-court proceedings." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 480 (1975). As we explain *infra*, at 311–313, the California Court of Appeal rejected appellant's federal claim that it was entitled to just compensation from the county for the taking of its property; this distinct issue of federal law will survive and require decision no matter how further proceedings resolve the issues concerning the liability of the Flood Control District for its cloud seeding operation.

[4] The Fifth Amendment provides "nor shall private property be taken for public use, without just compensation," and applies to the States through the Fourteenth Amendment. See *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897).

on these facts the California courts have decided the compensation question inconsistently with the requirements of the Fifth Amendment.

## I

Concerns with finality left us unable to reach the remedial question in the earlier cases where we have been asked to consider the rule of *Agins*. See *MacDonald, Sommer & Frates, supra,* at 351 (summarizing cases). In each of these cases, we concluded either that regulations considered to be in issue by the state court did not effect a taking, *Agins* v. *Tiburon,* 447 U. S., at 263, or that the factual disputes yet to be resolved by state authorities might still lead to the conclu-ion that no taking had occurred. *MacDonald, Sommer & Frates, supra,* at 351–353; *Williamson County, supra,* at 188–194; *San Diego Gas & Electric Co., supra,* at 631–632. Consideration of the remedial question in those circumstances, we concluded, would be premature.

The posture of the present case is quite different. Appellant's complaint alleged that "Ordinance No. 11,855 denies [it] all use of Lutherglen," and sought damages for this depri-vation. App. 12, 49. In affirming the decision to strike this allegation, the Court of Appeal assumed that the complaint sought "damages for the uncompensated *taking* of all use of Lutherglen by County Ordinance No. 11,855." App. to Juris. Statement A13–A14 (emphasis added). It relied on the California Supreme Court's *Agins* decision for the conclu-sion that "the remedy for a *taking* [is limited] to nonmonetary relief . . . ." App. to Juris. Statement A16 (emphasis added). The disposition of the case on these grounds isolates the remedial question for our consideration. The rejection of appellant's allegations did not rest on the view that they were false. Cf. *MacDonald, Sommer & Frates, supra,* at 352–353, n. 8 (California court rejected allegation in the complaint that appellant was deprived of all beneficial use of its prop-erty); *Agins* v. *Tiburon, supra,* at 259, n. 6 (same). Nor did the court rely on the theory that regulatory measures such as

Ordinance No. 11,855 may never constitute a taking in the constitutional sense. Instead, the claims were deemed irrelevant solely because of the California Supreme Court's decision in *Agins* that damages are unavailable to redress a "temporary" regulatory taking.[5] The California Court of Appeal has thus held that, regardless of the correctness of appellant's claim that the challenged ordinance denies it "all use of Lutherglen," appellant may not recover damages until the ordinance is finally declared unconstitutional, and then only for any period after that declaration for which the county seeks to enforce it. The constitutional question pretermitted in our earlier cases is therefore squarely presented here.[6]

We reject appellee's suggestion that, regardless of the state court's treatment of the question, we must independently evaluate the adequacy of the complaint and resolve the

---

[5] It has been urged that the California Supreme Court's discussion of the compensation question in *Agins* v. *Tiburon* was dictum, because the court had already decided that the regulations could not work a taking. See *Martino* v. *Santa Clara Valley Water District*, 703 F. 2d 1141, 1147 (CA9 1983) ("extended dictum"). The Court of Appeal in this case considered and rejected the possibility that the compensation discussion in *Agins* was dictum. See App. to Juris. Statement A14–A15, quoting *Aptos Seascape Corp.* v. *County of Santa Cruz*, 138 Cal. App. 3d 484, 493, 188 Cal. Rptr. 191, 195 (1982) ("[I]t is apparent that the Supreme Court itself did not intend its discussion [of inverse condemnation as a remedy for a taking] to be considered dictum . . . and it has not been treated as such in subsequent Court of Appeal cases"). Whether treating the claim as a takings claim is inconsistent with the first holding of *Agins* is not a matter for our concern. It is enough that the court did so for us to reach the remedial question.

[6] Our cases have also required that one seeking compensation must "seek compensation through the procedures the State has provided for doing so" before the claim is ripe for review. *Williamson County Regional Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172, 194 (1985). It is clear that appellant met this requirement. Having assumed that a taking occurred, the California court's dismissal of the action establishes that "the inverse condemnation procedure is unavailable . . . ." *Id.*, at 197. The compensation claim is accordingly ripe for our consideration.

takings claim on the merits before we can reach the remedial question. However "cryptic"—to use appellee's description—the allegations with respect to the taking were, the California courts deemed them sufficient to present the issue. We accordingly have no occasion to decide whether the ordinance at issue actually denied appellant all use of its property[7] or whether the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations. See, e. g., *Goldblatt* v. *Hempstead*, 369 U. S. 590 (1962); *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915); *Mugler* v. *Kansas*, 123 U. S. 623 (1887). These questions, of course, remain open for decision on the remand we direct today. We now turn to the question whether the Just Compensation Clause requires the government to pay for "temporary" regulatory takings.[8]

---

[7] Because the issue was not raised in the complaint or considered relevant by the California courts in their assumption that a taking had occurred, we also do not consider the effect of the county's permanent ordinance on the conclusions of the courts below. That ordinance, adopted in 1981 and reproduced at App. to Juris. Statement A32–A33, provides that "[a] person shall not use, erect, construct, move onto, or . . . alter, modify, enlarge or reconstruct any building or structure within the boundaries of a flood protection district except . . . [a]ccessory buildings and structures that will not substantially impede the flow of water, including sewer, gas, electrical, and water systems, approved by the county engineer . . . ; [a]utomobile parking facilities incidental to a lawfully established use; [and] [f]lood-control structures approved by the chief engineer of the Los Angeles County Flood Control District." County Code § 22.44.220.

[8] In addition to challenging the finality of the takings decision below, appellee raises two other challenges to our jurisdiction. First, going to both the appellate and certiorari jurisdiction of this Court under 28 U. S. C. § 1257, appellee alleges that appellant has failed to preserve for review any claim under federal law. Though the complaint in this case invoked only the California Constitution, appellant argued in the Court of Appeal that "recent Federal decisions . . . show the Federal Constitutional error in . . . *Agins*[ v. *Tiburon*, 24 Cal. 3d 266, 598 P. 2d 25 (1979)]." App. to Appellant's Opposition to Appellee's Second Motion to Dismiss A13. The Court of Appeal, by applying the state rule of *Agins* to dismiss appel-

## II

Consideration of the compensation question must begin with direct reference to the language of the Fifth Amendment, which provides in relevant part that "private property [shall not] be taken for public use, without just compensation." As its language indicates, and as the Court has frequently noted, this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power. See *Williamson County*, 473 U. S., at 194; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 297, n. 40 (1981); *Hurley* v.

lant's action, rejected on the merits the claim that the rule violated the United States Constitution. This disposition makes irrelevant for our purposes any deficiencies in the complaint as to federal issues. Where the state court has considered and decided the constitutional claim, we need not consider how or when the question was raised. *Manhattan Life Ins. Co.* v. *Cohen*, 234 U. S. 123, 134 (1914). Having succeeded in bringing the federal issue into the case, appellant preserved this question on appeal to the California Supreme Court, see App. to Appellant's Opposition to Appellee's Second Motion to Dismiss A14–A22, which declined to review its *Agins* decision. Accordingly, we find that the issue urged here was both raised and passed upon below.

Second, appellee challenges our appellate jurisdiction on the grounds that the case below did not draw "in question the validity of a statute of any state . . . ." 28 U. S. C. § 1257(2). There is, of course, no doubt that the ordinance at issue in this case is "a statute of [a] state" for purposes of § 1257. See *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 207, n. 3 (1975). As construed by the state courts, the complaint in this case alleged that the ordinance, by denying all use of the property, worked a taking without providing for just compensation. We have frequently treated such challenges to zoning ordinances as challenges to their validity under the Federal Constitution, and see no reason to revise that approach here. See, *e. g.*, *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340 (1986); *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982); *Agins* v. *Tiburon*, 447 U. S. 255 (1980); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978). By holding that the failure to provide compensation was not unconstitutional, moreover, the California courts upheld the validity of the ordinance against the particular federal constitutional question at issue here—just compensation—and the case is therefore within the terms of § 1257(2).

*Kincaid,* 285 U. S. 95, 104 (1932); *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336 (1893); *United States* v. *Jones,* 109 U. S. 513, 518 (1883). This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking. Thus, government action that works a taking of property rights necessarily implicates the "constitutional obligation to pay just compensation." *Armstrong* v. *United States,* 364 U. S. 40, 49 (1960).

We have recognized that a landowner is entitled to bring an action in inverse condemnation as a result of "'the self-executing character of the constitutional provision with respect to compensation . . . .'" *United States* v. *Clarke,* 445 U. S. 253, 257 (1980), quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972). As noted in JUSTICE BRENNAN's dissent in *San Diego Gas & Electric Co.,* 450 U. S., at 654–655, it has been established at least since *Jacobs* v. *United States,* 290 U. S. 13 (1933), that claims for just compensation are grounded in the Constitution itself:

> "The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. *That right was guaranteed by the Constitution.* The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. *The suits were thus founded upon the Constitution of the United States." Id.,* at 16. (Emphasis added.)

*Jacobs,* moreover, does not stand alone, for the Court has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution. See, *e. g., Kirby Forest Industries, Inc.* v. *United States,* 467 U. S. 1, 5 (1984); *United States* v. *Causby,* 328 U. S. 256, 267 (1946); *Seaboard Air Line R. Co.* v. *United States,* 261 U. S. 299, 304–306 (1923); *Monongahela Navigation, supra,* at 327.[9]

It has also been established doctrine at least since Justice Holmes' opinion for the Court in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), that "[t]he general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.,* at 415. While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings. In *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, 177–178 (1872), construing a provision in the Wisconsin Constitution identical to the Just Compensation Clause, this Court said:

> "It would be a very curious and unsatisfactory result, if . . . it shall be held that if the government refrains from the absolute conversion of real property to the uses of

_____

[9] The Solicitor General urges that the prohibitory nature of the Fifth Amendment, see *supra,* at 314, combined with principles of sovereign immunity, establishes that the Amendment itself is only a limitation on the power of the Government to act, not a remedial provision. The cases cited in the text, we think, refute the argument of the United States that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government." Brief for United States as *Amicus Curiae* 14. Though arising in various factual and jurisdictional settings, these cases make clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking. See *San Diego Gas & Electric Co.* v. *San Diego,* 450 U. S. 621, 655, n. 21 (1981) (BRENNAN, J., dissenting), quoting *United States* v. *Dickinson,* 331 U. S. 745, 748 (1947).

the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use."

Later cases have unhesitatingly applied this principle. See, *e. g., Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979); *United States* v. *Dickinson,* 331 U. S. 745, 750 (1947); *United States* v. *Causby, supra.*

While the California Supreme Court may not have actually disavowed this general rule in *Agins,* we believe that it has truncated the rule by disallowing damages that occurred prior to the ultimate invalidation of the challenged regulation. The California Supreme Court justified its conclusion at length in the *Agins* opinion, concluding that:

"In combination, the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances." 24 Cal. 3d, at 276–277, 598 P. 2d, at 31.

We, of course, are not unmindful of these considerations, but they must be evaluated in the light of the command of the Just Compensation Clause of the Fifth Amendment. The Court has recognized in more than one case that the government may elect to abandon its intrusion or discontinue regulations. See, *e. g., Kirby Forest Industries, Inc.* v. *United States, supra; United States* v. *Dow,* 357 U. S. 17, 26 (1958). Similarly, a governmental body may acquiesce in a judicial declaration that one of its ordinances has effected an unconstitutional taking of property; the landowner has no right under the Just Compensation Clause to insist that a "temporary" taking be deemed a permanent taking. But we have

not resolved whether abandonment by the government requires payment of compensation for the period of time during which regulations deny a landowner all use of his land.

In considering this question, we find substantial guidance in cases where the government has only temporarily exercised its right to use private property. In *United States* v. *Dow, supra,* at 26, though rejecting a claim that the Government may not abandon condemnation proceedings, the Court observed that abandonment "results in an alteration in the property interest taken—from [one of] full ownership to one of temporary use and occupation. . . . In such cases compensation would be measured by the principles normally governing the taking of a right to use property temporarily. See *Kimball Laundry Co.* v. *United States,* 338 U. S. 1 [1949]; *United States* v. *Petty Motor Co.,* 327 U. S. 372 [1946]; *United States* v. *General Motors Corp.,* 323 U. S. 373 [1945]." Each of the cases cited by the *Dow* Court involved appropriation of private property by the United States for use during World War II. Though the takings were in fact "temporary," see *United States* v. *Petty Motor Co.,* 327 U. S. 372, 375 (1946), there was no question that compensation would be required for the Government's interference with the use of the property; the Court was concerned in each case with determining the proper measure of the monetary relief to which the property holders were entitled. See *Kimball Laundry Co.* v. *United States,* 338 U. S. 1, 4–21 (1949); *Petty Motor Co., supra,* at 377–381; *United States* v. *General Motors Corp.,* 323 U. S. 373, 379–384 (1945).

These cases reflect the fact that "temporary" takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation. Cf. *San Diego Gas & Electric Co.,* 450 U. S., at 657 (BRENNAN, J., dissenting) ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable"). It is axiomatic that the Fifth Amendment's just compensation provision is "designed to bar Government from forcing some

people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S., at 49. See also *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 123–125 (1978); *Monongahela Navigation Co.* v. *United States*, 148 U. S., at 325. In the present case the interim ordinance was adopted by the County of Los Angeles in January 1979, and became effective immediately. Appellant filed suit within a month after the effective date of the ordinance and yet when the California Supreme Court denied a hearing in the case on October 17, 1985, the merits of appellant's claim had yet to be determined. The United States has been required to pay compensation for leasehold interests of shorter duration than this. The value of a leasehold interest in property for a period of years may be substantial, and the burden on the property owner in extinguishing such an interest for a period of years may be great indeed. See, *e. g.*, *United States* v. *General Motors*, *supra*. Where this burden results from governmental action that amounted to a taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period. Cf. *United States* v. *Causby*, 328 U. S., at 261 ("It is the owner's loss, not the taker's gain, which is the measure of the value of the property taken"). Invalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a "temporary" one, is not a sufficient remedy to meet the demands of the Just Compensation Clause.

Appellee argues that requiring compensation for denial of all use of land prior to invalidation is inconsistent with this Court's decisions in *Danforth* v. *United States*, 308 U. S. 271 (1939), and *Agins* v. *Tiburon*, 447 U. S. 255 (1980). In *Danforth*, the landowner contended that the "taking" of his property had occurred prior to the institution of condemnation proceedings, by reason of the enactment of the Flood Control Act itself. He claimed that the passage of that Act had di-

minished the value of his property because the plan embodied in the Act required condemnation of a flowage easement across his property. The Court held that in the context of condemnation proceedings a taking does not occur until compensation is determined and paid, and went on to say that "[a] reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project," but "[s]uch changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Danforth, supra,* at 285. *Agins* likewise rejected a claim that the city's preliminary activities constituted a taking, saying that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership.'" See 447 U. S., at 263, n. 9.

But these cases merely stand for the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking, and that depreciation in value of the property by reason of preliminary activity is not chargeable to the government. Thus, in *Agins,* we concluded that the preliminary activity did not work a taking. It would require a considerable extension of these decisions to say that no compensable regulatory taking may occur until a challenged ordinance has ultimately been held invalid.[10]

---

[10] *Williamson County Regional Planning Comm'n,* is not to the contrary. There, we noted that "no constitutional violation occurs until just compensation has been denied." 473 U. S., at 194, n. 13. This statement, however, was addressed to the issue whether the constitutional claim was ripe for review and did not establish that compensation is unavailable for government activity occurring before compensation is actually denied. Though, as a matter of law, an illegitimate taking might not occur until the government refuses to pay, the interference that effects a taking might begin much earlier, and compensation is measured from that time. See *Kirby Forest Industries, Inc.* v. *United States,* 467 U. S. 1, 5 (1984) (Where Government physically occupies land without condemnation proceedings, "the owner has a right to bring an 'inverse condemnation' suit to

Nothing we say today is intended to abrogate the principle that the decision to exercise the power of eminent domain is a legislative function "'for Congress and Congress alone to determine.'" *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 240 (1984), quoting *Berman* v. *Parker*, 348 U. S. 26, 33 (1954). Once a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain. Thus we do not, as the Solicitor General suggests, "permit a court, at the behest of a private person, to require the . . . Government to exercise the power of eminent domain . . . ." Brief for United States as *Amicus Curiae* 22. We merely hold that where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.

We also point out that the allegation of the complaint which we treat as true for purposes of our decision was that the ordinance in question denied appellant all use of its property. We limit our holding to the facts presented, and of course do not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us. We realize that even our present holding will undoubtedly lessen to some extent the freedom and flexibility of land-use planners and governing bodies of municipal corporations when enacting land-use regulations. But such consequences necessarily flow from any decision upholding a claim of constitutional right; many of the provisions of the Constitution are designed to limit the flexibility and freedom of governmental authorities, and the Just Compensation Clause of the Fifth Amendment is one of them. As Justice Holmes aptly noted more than 50 years ago, "a strong public

recover the value of the land *on the date of the intrusion by the Government*"). (Emphasis added.)

desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 416.

Here we must assume that the Los Angeles County ordinance has denied appellant all use of its property for a considerable period of years, and we hold that invalidation of the ordinance without payment of fair value for the use of the property during this period of time would be a constitutionally insufficient remedy. The judgment of the California Court of Appeal is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join as to Parts I and III, dissenting.

One thing is certain. The Court's decision today will generate a great deal of litigation. Most of it, I believe, will be unproductive. But the mere duty to defend the actions that today's decision will spawn will undoubtedly have a significant adverse impact on the land-use regulatory process. The Court has reached out to address an issue not actually presented in this case, and has then answered that self-imposed question in a superficial and, I believe, dangerous way.

Four flaws in the Court's analysis merit special comment. First, the Court unnecessarily and imprudently assumes that appellant's complaint alleges an unconstitutional taking of Lutherglen. Second, the Court distorts our precedents in the area of regulatory takings when it concludes that all ordinances which would constitute takings if allowed to remain in effect permanently, necessarily also constitute takings if they are in effect for only a limited period of time. Third, the Court incorrectly assumes that the California Supreme Court has already decided that it will never allow a state court to grant monetary relief for a temporary regulatory taking, and

then uses that conclusion to reverse a judgment which is correct under the Court's own theories. Finally, the Court errs in concluding that it is the Takings Clause, rather than the Due Process Clause, which is the primary constraint on the use of unfair and dilatory procedures in the land-use area.

## I

In the relevant portion of its complaint for inverse condemnation, appellant alleged:

"16

"On January 11, 1979, the County adopted Ordinance No. 11,855, which provides:

"'Section 1. A person shall not construct, reconstruct, place or enlarge any building or structure, any portion of which is, or will be, located within the outer boundary lines of the interim flood protection area located in Mill Creek Canyon, vicinity of Hidden Springs, as shown on Map No. 63 ML 52, attached hereto and incorporated herein by reference as though fully set forth.'

"17

"Lutherglen is within the flood protection area created by Ordinance No. 11,855.

"18

"Ordinance No. 11,855 denies First Church all use of Lutherglen." App. 49.

Because the Church sought only compensation, and did not request invalidation of the ordinance, the Superior Court granted a motion to strike those three paragraphs, and consequently never decided whether they alleged a "taking."[1]

---

[1] The Superior Court's entire explanation for its decision to grant the motion to strike reads as follows:

"However a careful rereading of the *Agins* case persuades the Court that when an ordinance, even a non-zoning ordinance, deprives a person of the total use of his lands, his challenge to the ordinance is by way of declaratory relief or possibly mandamus." App. 26.

The Superior Court granted the motion to strike on the basis of the rule announced in *Agins* v. *Tiburon*, 24 Cal. 3d 266, 598 P. 2d 25 (1979). Under the rule of that case, a property owner who claims that a land-use restriction has taken property for public use without compensation must file an action seeking invalidation of the regulation, and may not simply demand compensation. The Court of Appeal affirmed on the authority of *Agins* alone,[2] also without holding that the complaint had alleged a violation of either the California Constitution or the Federal Constitution. At most, it assumed, *arguendo*, that a constitutional violation had been alleged.

This Court clearly has the authority to decide this case by ruling that the complaint did not allege a taking under the Federal Constitution,[3] and therefore to avoid the novel con-

---

[2] The Court of Appeal described the *Agins* case in this way:

"In *Agins* v. *City of Tiburon* (1979) 24 Cal. 3d 266, the plaintiffs filed an action for damages in inverse condemnation and for declaratory relief against the City of Tiburon, which had passed a zoning ordinance in part for 'open space' that would have permitted a maximum of five or a minimum of one dwelling units on the plaintiffs' five acres. A demurrer to both causes of action was sustained, and a judgment of dismissal was entered. The California Supreme Court affirmed the dismissal, finding that the ordinance did not on its face 'deprive the landowner of substantially all reasonable use of his property,' (*Agins*, *supra*, 24 Cal. 3d, at p. 277), and did not 'unconstitutionally interfere with plaintiff's entire use of the land or impermissibly decrease its value' *(ibid.)*. The Supreme Court further said that 'mandamus or declaratory relief rather than inverse condemnation [was] the appropriate relief under the circumstances.' *(Ibid.)*." App. to Juris. Statement A14.

[3] "The familiar rule of appellate court procedure in federal courts [is] that, without a cross-petition or appeal, a respondent or appellee may support the judgment in his favor upon grounds different from those upon which the court below rested its decision." *McGoldrick* v. *Compagnie Generale*, 309 U. S. 430, 434 (1940), citing *United States* v. *American Railway Express Co.*, 265 U. S. 425, 435 (1924); see also *Dandridge* v. *Williams*, 397 U. S. 471, 475–476, n. 6 (1970). It is also well settled that this Court is not bound by a state court's determination (much less an assumption) that a complaint states a federal claim. See *Staub* v. *City of Baxley*, 355 U. S. 313, 318 (1958); *First National Bank of Guthrie Center* v. *Anderson*,

stitutional issue that it addresses. Even though I believe the Court's lack of self-restraint is imprudent, it is imperative to stress that the Court does not hold that appellant is entitled to compensation as a result of the flood protection regulation that the county enacted. No matter whether the regulation is treated as one that deprives appellant of its property on a permanent or temporary basis, this Court's precedents demonstrate that the type of regulatory program at issue here cannot constitute a taking.

"Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.'" *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 491–492 (1987), quoting *Mugler* v. *Kansas*, 123 U. S. 623, 665 (1887). Thus, in order to protect the health and safety of the community,[4] government may condemn unsafe structures,

---

269 U. S. 341, 346 (1926). Especially in the takings context, where the details of the deprivation are so significant, the economic drain of litigation on public resources is "too great to permit cases to go forward without a more substantial indication that a constitutional violation may have occurred." *Pace Resources, Inc.* v. *Shrewsbury Township*, 808 F. 2d 1023, 1026 (CA3), cert. denied, *post*, p. 906.

[4] See *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 485–493 (1987) (coal mine subsidence); *Goldblatt* v. *Hempstead*, 369 U. S. 590 (1962) (rock quarry excavation); *Miller* v. *Schoene*, 276 U. S. 272 (1928) (infectious tree disease); *Hadacheck* v. *Sebastian*, 239 U. S. 394 (1915) (emissions from factory); *Mugler* v. *Kansas*, 123 U. S. 623 (1887) (intoxicating liquors); see also *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 145 (1978) (REHNQUIST, J., dissenting) ("The question is whether the forbidden use is dangerous to the safety, health, or welfare of others"). Many state courts have reached the identical conclusion. See *Keystone Bituminous, supra*, at 492, n. 22 (citing cases).

In *Keystone Bituminous* we explained that one of the justifications for the rule that health and safety regulation cannot constitute a taking is that individuals hold their property subject to the limitation that they not use it in dangerous or noxious ways. 480 U. S., at 491, n. 20. The Court's recent decision in *United States* v. *Cherokee Nation of Oklahoma*, 480 U. S. 700 (1987), adds support to this thesis. There, the Court reaffirmed the traditional rule that when the United States exercises its power to assert a

may close unlawful business operations, may destroy infected trees, and surely may restrict access to hazardous areas —for example, land on which radioactive materials have been discharged, land in the path of a lava flow from an erupting volcano, or land in the path of a potentially life-threatening flood.[5] When a governmental entity imposes these types of health and safety regulations, it may not be "burdened with the condition that [it] must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." *Mugler, supra,* at 668–669; see generally *Keystone Bituminous, supra,* at 485–493.

In this case, the legitimacy of the county's interest in the enactment of Ordinance No. 11,855 is apparent from the face of the ordinance and has never been challenged.[6] It was en-

---

navigational servitude it does not "take" property because the damage sustained results "from the lawful exercise of a power to which the interests of riparian owners have always been subject." *Id.,* at 704.

[5] See generally Plater, The Takings Issue in a Natural Setting: Floodlines and the Police Power, 52 Tex. L. Rev. 201 (1974); F. Bosselman, D. Callies, & J. Banta, The Taking Issue 147–155 (1973).

[6] It is proper to take judicial notice of the ordinance. It provides, in relevant part:

"ORDINANCE NO. 11,855.

"An interim ordinance temporarily prohibiting the construction, reconstruction, placement or enlargement of any building or structure within any portion of the interim flood protection area delineated within Mill Creek, vicinity of Hidden Springs, declaring the urgency thereof and that this ordinance shall take immediate effect.

"The Board of Supervisors of the County of Los Angeles does ordain as follows:

.    .    .    .    .

"Section 4. Studies are now under way by the Department of Regional Planning in connection with the County Engineer and the Los Angeles County Flood Control District, to develop permanent flood protection areas for Mill Creek and other specific areas as part of a comprehensive flood plain management project. Mapping and evaluation of flood data has progressed to the point where an interim flood protection area in Mill

acted as an "interim" measure "temporarily prohibiting" certain construction in a specified area because the County Board believed the prohibition was "urgently required for the immediate preservation of the public health and safety." Even if that were not true, the strong presumption of constitutionality that applies to legislative enactments certainly requires one challenging the constitutionality of an ordinance of this kind to allege some sort of improper purpose or insufficient justification in order to state a colorable federal claim for relief. A presumption of validity is particularly appropriate in this case because the complaint did not even allege that the ordinance is invalid, or pray for a declaration of invalidity or an injunction against its enforcement.[7] Nor did it allege any facts indicating how the ordinance interfered with any future use of the property contemplated or planned by appellant. In light of the tragic flood and the loss of life that pre-

Creek can be designated. Development is now occurring which will encroach within the limits of the permanent flood protection area and which will be incompatible with the anticipated uses to be permitted within the permanent flood protection area. If this ordinance does not take immediate effect, said uses will be established prior to the contemplated ordinance amendment, and once established may continue after such amendment has been made because of the provisions of Article 9 of Chapter 5 of Ordinance No. 1494.

"By reason of the foregoing facts this ordinance is urgently required for the immediate preservation of the public health and safety, and the same shall take effect immediately upon passage thereof." App. to Juris. Statement 31–32.

[7] Because the complaint did not pray for an injunction against enforcement of the ordinance, or a declaration that it is invalid, but merely sought monetary relief, it is doubtful that we have appellate jurisdiction under 28 U. S. C. § 1257(2). Section 1257(2) provides:

"(2) By appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity."

Even if we do not have appellate jurisdiction, however, presumably the Court would exercise its certiorari jurisdiction pursuant to 28 U. S. C. § 1257(3).

cipitated the safety regulations here, it is hard to understand how appellant ever expected to rebuild on Lutherglen.

Thus, although the Court uses the allegations of this complaint as a springboard for its discussion of a discrete legal issue, it does not, and could not under our precedents, hold that the allegations sufficiently alleged a taking or that the county's effort to preserve life and property could ever constitute a taking. As far as the United States Constitution is concerned, the claim that the ordinance was a taking of Lutherglen should be summarily rejected on its merits.

## II

There is no dispute about the proposition that a regulation which goes "too far" must be deemed a taking. See *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922). When that happens, the government has a choice: it may abandon the regulation or it may continue to regulate and compensate those whose property it takes. In the usual case, either of these options is wholly satisfactory. Paying compensation for the property is, of course, a constitutional prerogative of the sovereign. Alternatively, if the sovereign chooses not to retain the regulation, repeal will, in virtually all cases, mitigate the overall effect of the regulation so substantially that the slight diminution in value that the regulation caused while in effect cannot be classified as a taking of property. We may assume, however, that this may not always be the case. There may be some situations in which even the temporary existence of a regulation has such severe consequences that invalidation or repeal will not mitigate the damage enough to remove the "taking" label. This hypothetical situation is what the Court calls a "temporary taking." But, contrary to the Court's implications, the fact that a regulation would constitute a taking if allowed to remain in effect permanently is by no means dispositive of the question whether the effect that the regulation has already had on the

property is so severe that a taking occurred during the period before the regulation was invalidated.

A temporary interference with an owner's use of his property may constitute a taking for which the Constitution requires that compensation be paid. At least with respect to physical takings, the Court has so held. See *ante*, at 318 (citing cases). Thus, if the government appropriates a leasehold interest and uses it for a public purpose, the return of the premises at the expiration of the lease would obviously not erase the fact of the government's temporary occupation. Or if the government destroys a chicken farm by building a road through it or flying planes over it, removing the road or terminating the flights would not palliate the physical damage that had already occurred. These examples are consistent with the rule that even minimal physical occupations constitute takings which give rise to a duty to compensate. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419 (1982).

But our cases also make it clear that regulatory takings and physical takings are very different in this, as well as other, respects. While virtually all physical invasions are deemed takings, see, *e. g.*, *Loretto, supra; United States* v. *Causby*, 328 U. S. 256 (1946), a regulatory program that adversely affects property values does not constitute a taking unless it destroys a major portion of the property's value. See *Keystone Bituminous*, 480 U. S., at 493–502; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 296 (1981); *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980). This diminution of value inquiry is unique to regulatory takings. Unlike physical invasions, which are relatively rare and easily identifiable without making any economic analysis, regulatory programs constantly affect property values in countless ways, and only the most extreme regulations can constitute takings. Some dividing line must be established between everyday regulatory inconveniences and those so severe that they constitute takings. The diminution of value

inquiry has long been used in identifying that line. As Justice Holmes put it: "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal, supra,* at 413. It is this basic distinction between regulatory and physical takings that the Court ignores today.

Regulations are three dimensional; they have depth, width, and length. As for depth, regulations define the extent to which the owner may not use the property in question. With respect to width, regulations define the amount of property encompassed by the restrictions. Finally, and for purposes of this case, essentially, regulations set forth the duration of the restrictions. It is obvious that no one of these elements can be analyzed alone to evaluate the impact of a regulation, and hence to determine whether a taking has occurred. For example, in *Keystone Bituminous* we declined to focus in on any discrete segment of the coal in the petitioners' mines, but rather looked to the effect that the restriction had on their entire mining project. See 480 U. S., at 493–502; see also *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 137 (1978) (looking at owner's other buildings). Similarly, in *Penn Central,* the Court concluded that it was error to focus on the nature of the uses which were prohibited without also examining the many profitable uses to which the property could still be put. *Id.,* at 130–131; see also *Agins, supra,* at 262–263; *Andrus* v. *Allard,* 444 U. S. 51, 64–67 (1979). Both of these factors are essential to a meaningful analysis of the economic effect that regulations have on the value of property and on an owner's reasonable investment-based expectations with respect to the property.

Just as it would be senseless to ignore these first two factors in assessing the economic effect of a regulation, one cannot conduct the inquiry without considering the duration of the restriction. See generally Williams, Smith, Siemon,

Mandelker, & Babcock, The White River Junction Manifesto, 9 Vt. L. Rev. 193, 215–218 (1984). For example, while I agreed with the Chief Justice's view that the permanent restriction on building involved in *Penn Central* constituted a taking, I assume that no one would have suggested that a temporary freeze on building would have also constituted a taking. Similarly, I am confident that even the dissenters in *Keystone Bituminous* would not have concluded that the restriction on bituminous coal mining would have constituted a taking had it simply required the mining companies to delay their operations until an appropriate safety inspection could be made.

On the other hand, I am willing to assume that some cases may arise in which a property owner can show that prospective invalidation of the regulation cannot cure the taking—that the temporary operation of a regulation has caused such a significant diminution in the property's value that compensation must be afforded for the taking that has already occurred. For this ever to happen, the restriction on the use of the property would not only have to be a substantial one, but it would also have to remain in effect for a significant percentage of the property's useful life. In such a case an application of our test for regulatory takings would obviously require an inquiry into the duration of the restriction, as well as its scope and severity. See *Williamson County Regional Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172, 190–191 (1985) (refusing to evaluate taking claim when the long-term economic effects were uncertain because it was not clear that restrictions would remain in effect permanently).

The cases that the Court relies upon for the proposition that there is no distinction between temporary and permanent takings, see *ante*, at 318, are inapposite, for they all deal with physical takings—where the diminution of value test is inapplicable.[8] None of those cases is controversial; the state

---

[8] In *United States* v. *Dow*, 357 U. S. 17 (1958), the United States had "entered into physical possession and began laying the pipe line through

certainly may not occupy an individual's home for a month and then escape compensation by leaving and declaring the occupation "temporary." But what does that have to do with the proper inquiry for regulatory takings? Why should there be a constitutional distinction between a permanent restriction that only reduces the economic value of the property by a fraction—perhaps one-third—and a restriction that merely postpones the development of a property for a fraction of its useful life—presumably far less than a third? In the former instance, no taking has occurred; in the latter case, the Court now proclaims that compensation for a taking must be provided. The Court makes no effort to explain these irreconcilable results. Instead, without any attempt to fit its proclamation into our regulatory takings cases, the Court boldly announces that once a property owner makes out a claim that a regulation would constitute a taking if allowed to stand, then he or she is entitled to damages for the period of time between its enactment and its invalidation.

Until today, we have repeatedly rejected the notion that all temporary diminutions in the value of property automatically activate the compensation requirement of the Takings Clause. In *Agins*, we held:

> "The State Supreme Court correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. . . . Even if the appellants' ability to sell their property was

---

the tract." *Id.*, at 19. In *Kimball Laundry Co.* v. *United States*, 338 U. S. 1 (1949), the United States Army had taken possession of the laundry plant including all "the facilities of the company, except delivery equipment." *Id.*, at 3. In *United States* v. *Petty Motor Co.*, 327 U. S. 372 (1946), the United States acquired by condemnation a building occupied by tenants and ordered the tenants to vacate. In *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945), the Government occupied a portion of a leased building.

limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" 447 U. S., at 263, n. 9, quoting *Danforth* v. *United States*, 308 U. S. 271, 285 (1939).[9]

Our more recent takings cases also cut against the approach the Court now takes. In *Williamson, supra,* and *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340 (1986), we held that we could not review a taking claim as long as the property owner had an opportunity to obtain a variance or some other form of relief from the zoning authorities that would permit the development of the property to go forward. See *Williamson, supra,* at 190–191; *Yolo County, supra,* at 348–353. Implicit in those holdings was the assumption that the temporary deprivation of all use of the property would not constitute a taking if it would be adequately remedied by a belated grant of approval of the developer's plans. See Sallet, Regulatory "Takings" and Just Compensation: The Supreme Court's Search for a Solution Continues, 18 Urb. Law. 635, 653 (1986).

---

[9] The Court makes only a feeble attempt to explain why the holdings in *Agins* and *Danforth* are not controlling here. It is tautological to claim that the cases stand for the "unexceptional proposition that the valuation of property which has been taken must be calculated *as of the time of the taking*." *Ante,* at 320 (emphasis added). The question in *Danforth* was when the taking occurred. The question addressed in the relevant portion of *Agins* was whether the temporary fluctuations in value themselves constituted a taking. In rejecting the claims in those cases, the Court necessarily held that the temporary effects did not constitute takings of their own right. The cases are therefore directly on point here. If even the temporary effects of a decision to condemn, the ultimate taking, do not ordinarily constitute a taking in and of themselves, then, *a fortiori,* the temporary effects of a regulation should not.

The Court's reasoning also suffers from severe internal inconsistency. Although it purports to put to one side "normal delays in obtaining building permits, changes in zoning ordinances, variances and the like," *ante*, at 321, the Court does not explain why there is a constitutional distinction between a total denial of all use of property during such "normal delays" and an equally total denial for the same length of time in order to determine whether a regulation has "gone too far" to be sustained unless the government is prepared to condemn the property. Precisely the same interference with a real estate developer's plans may be occasioned by protracted proceedings which terminate with a zoning board's decision that the public interest would be served by modification of its regulation and equally protracted litigation which ends with a judicial determination that the existing zoning restraint has "gone too far," and that the board must therefore grant the developer a variance. The Court's analysis takes no cognizance of these realities. Instead, it appears to erect an artificial distinction between "normal delays" and the delays involved in obtaining a court declaration that the regulation constitutes a taking.[10]

In my opinion, the question whether a "temporary taking" has occurred should not be answered by simply looking at the reason a temporary interference with an owner's use of his property is terminated.[11] Litigation challenging the validity of a land-use restriction gives rise to a delay that is just as "normal" as an administrative procedure seeking a variance

---

[10] Whether delays associated with a judicial proceeding that terminates with a holding that a regulation was not authorized by state law would be a "normal delay" or a temporary taking depends, I suppose, on the unexplained rationale for the Court's artificial distinction.

[11] "[T]he Constitution measures a taking of property not by what a State says, or what it intends, but by what it *does.*" *Hughes* v. *Washington*, 389 U. S. 290, 298 (1967) (Stewart, J., concurring). The fact that the effects of the regulation are stopped by judicial, as opposed to administrative decree, should not affect the question whether compensation is required.

or an approval of a controversial plan.[12]   Just because a plaintiff can prove that a land-use restriction would constitute a taking if allowed to remain in effect permanently does not mean that he or she can also prove that its temporary application rose to the level of a constitutional taking.

## III

The Court recognizes that the California courts have the right to adopt invalidation of an excessive regulation as the appropriate remedy for the permanent effects of overburdensome regulations, rather than allowing the regulation to stand and ordering the government to afford compensation for the permanent taking.   See *ante*, at 319; see also *Yolo County, supra*, at 362–363, and n. 4 (WHITE, J., dissenting); *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621, 657 (1981) (BRENNAN, J., dissenting).   The difference between these two remedies is less substantial than one might assume.   When a court invalidates a regulation, the Legislative or Executive Branch must then decide whether to condemn the property in order to proceed with the regulatory scheme.   On the other hand, if the court requires compensation for a permanent taking, the Executive or Legislative Branch may still repeal the regulation and thus prevent the permanent taking.   The difference, therefore, is only in what will happen in the case of Legislative or Executive inertia. Many scholars have debated the respective merits of the alternative approaches in light of separation-of-powers concerns,[13] but our only concern is with a *state court's* decision on

---

[12] States may surely provide a forum in their courts for review of general challenges to zoning ordinances and other regulations.   Such a procedure then becomes part of the "normal" process.   Indeed, when States have set up such procedures in their courts, we have required resort to those processes before considering takings claims.   See *Williamson County Regional Planning Comm'n* v. *Hamilton Bank*, 473 U. S. 172 (1985).

[13] See, *e. g.*, Mandelker, Land Use Takings: The Compensation Issue, 8 Hastings Const. L. Q. 491 (1981); Williams, Smith, Siemon, Mandelker, & Babcock, The White River Junction Manifesto, 9 Vt. L. Rev. 193, 233–234

which procedure it considers more appropriate. California is fully competent to decide how it wishes to deal with the separation-of-powers implications of the remedy it routinely uses.[14]

Once it is recognized that California may deal with the permanent taking problem by invalidating objectionable regulations, it becomes clear that the California Court of Appeal's decision in this case should be affirmed. Even if this Court is correct in stating that one who makes out a claim for a permanent taking is automatically entitled to some compensation for the temporary aspect of the taking as well, the States still have the right to deal with the permanent aspect of a taking by invalidating the regulation. That is all that the California courts have done in this case. They have refused to proceed upon a complaint which sought only damages, and which did not contain a request for a declaratory invalidation of the regulation, as clearly required by California precedent.

The Court seriously errs, therefore, when it claims that the California court held that "a landowner who claims that his property has been 'taken' by a land-use regulation may not recover damages for the time before it is finally determined that the regulation constitutes a 'taking' of his property." *Ante*, at 306–307. Perhaps the Court discerns such a practice from some of the California Supreme Court's earlier decisions, but that is surely no reason for reversing a procedural judgment in a case in which the dismissal of the complaint was entirely consistent with an approach that the

---

(1984); Berger & Kanner, Thoughts on the *White River Junction Manifesto:* A Reply to the "Gang of Five's" Views on Just Compensation for Regulatory Taking of Property, 19 Loyola (LA) L. Rev. 685, 704–712 (1986); Comment, Just Compensation or Just Invalidation: The Availability of a Damages Remedy in Challenging Land Use Regulations, 29 UCLA L. Rev. 711, 725–726 (1982).

[14] For this same reason, the parties' and *amici's* conflicting claims about whether this Court's cases, such as *Hurley* v. *Kincaid*, 285 U. S. 95 (1932), provide that compensation is a less intrusive remedy than invalidation, are not relevant here.

Court endorses. Indeed, I am not all that sure how the California courts would deal with a landowner who seeks both invalidation of the regulation and damages for the temporary taking that occurred prior to the requested invalidation.

As a matter of regulating the procedure in its own state courts, the California Supreme Court has decided that mandamus or declaratory relief rather than inverse condemnation provides "the appropriate relief" for one who challenges a regulation as a taking. *Agins* v. *Tiburon*, 24 Cal. 3d, at 277, 598 P. 2d, at 31. This statement in *Agins* can be interpreted in two quite different ways. First, it may merely require the property owner to exhaust his equitable remedies before asserting any claim for damages. Under that reading, a postponement of any consideration of monetary relief, or even a requirement that a "temporary regulatory taking" claim be asserted in a separate proceeding after the temporary interference has ended, would not violate the Federal Constitution. Second, the *Agins* opinion may be read to indicate that California courts will never award damages for a temporary regulatory taking.[15] Even if we assume that such a rigid rule would bar recovery in the California courts in a few meritorious cases, we should not allow a litigant to challenge the rule unless his complaint contains allegations explaining why declaratory relief would not provide him with an adequate remedy, and unless his complaint at least complies with the California rule of procedure to the extent that the rule is clearly legitimate. Since the First Amendment is not implicated, the fact that California's rule may be somewhat "overbroad" is no reason for permitting a party to complain about the impact of the rule on other property owners

---

[15] The California Supreme Court's discussion of the policy implications in *Agins* is entirely consistent with the view that the court was choosing between remedies (invalidation or compensation) with respect to the permanent effect of a regulation, and was not dealing with the temporary taking question at all. Subsequent California Supreme Court cases applying the *Agins* rule do not shed light on this question.

who actually file complaints that call California's rule into question.

In any event, the Court has no business speculating on how the California courts will deal with this problem when it is presented to them. Despite the many cases in which the California courts have applied the *Agins* rule, the Court can point to no case in which application of the rule has deprived a property owner of his rightful compensation.

In criminal litigation we have steadfastly adhered to the practice of requiring the defendant to exhaust his or her state remedies before collaterally attacking a conviction based on a claimed violation of the Federal Constitution. That requirement is supported by our respect for the sovereignty of the several States and by our interest in having federal judges decide federal constitutional issues only on the basis of fully developed records. See generally *Rose* v. *Lundy*, 455 U. S. 509 (1982). The States' interest in controlling land-use development and in exploring all the ramifications of a challenge to a zoning restriction should command the same deference from the federal judiciary. See *Williamson*, 473 U. S., at 194–197. And our interest in avoiding the decision of federal constitutional questions on anything less than a fully informed basis counsels against trying to decide whether equitable relief has forestalled a temporary taking until after we know what the relief is. In short, even if the California courts adhere to a rule of never granting monetary relief for a temporary regulatory taking, I believe we should require the property owner to exhaust his state remedies before confronting the question whether the net result of the state proceedings has amounted to a temporary taking of property without just compensation. In this case, the Church should be required to pursue an action demanding invalidation of the ordinance prior to seeking this Court's review of California's procedures.[16]

---

[16] In the habeas corpus context, we have held that a prisoner has not exhausted his state remedies when the state court refuses to consider his

The appellant should not be permitted to circumvent that requirement by omitting any prayer for equitable relief from its complaint. I believe the California Supreme Court is justified in insisting that the owner recover as much of its property as possible before foisting any of it on an unwilling governmental purchaser. The Court apparently agrees with this proposition. Thus, even on the Court's own radical view of temporary regulatory takings announced today, the California courts had the right to strike this complaint.

## IV

There is, of course, a possibility that land-use planning, like other forms of regulation, will unfairly deprive a citizen of the right to develop his property at the time and in the manner that will best serve his economic interests. The "regulatory taking" doctrine announced in *Pennsylvania Coal* places a limit on the permissible scope of land-use restrictions. In my opinion, however, it is the Due Process Clause rather than that doctrine that protects the property owner from improperly motivated, unfairly conducted, or unnecessarily protracted governmental decisionmaking. Violation of the procedural safeguards mandated by the Due Process Clause will give rise to actions for damages under 42 U. S. C. §1983, but I am not persuaded that delays in the development of property that are occasioned by fairly conducted administrative or judicial proceedings are compensable, except perhaps in the most unusual circumstances. On the contrary, I am convinced that the public interest in having important governmental decisions made in an orderly, fully informed way amply justifies the temporary burden on the citizen that is the inevitable by-product of democratic government.

---

claim because he has not sought the appropriate state remedy. See *Woods v. Nierstheimer*, 328 U. S. 211, 216 (1946); *Ex parte Hawk*, 321 U. S. 114, 116–117 (1944). This rule should be applied with equal force here.

As I recently wrote:

> "The Due Process Clause of the Fourteenth Amendment requires a State to employ fair procedures in the administration and enforcement of all kinds of regulations. It does not, however, impose the utopian requirement that enforcement action may not impose any cost upon the citizen unless the government's position is completely vindicated. We must presume that regulatory bodies such as zoning boards, school boards, and health boards, generally make a good-faith effort to advance the public interest when they are performing their official duties, but we must also recognize that they will often become involved in controversies that they will ultimately lose. Even though these controversies are costly and temporarily harmful to the private citizen, as long as fair procedures are followed, I do not believe there is any basis in the Constitution for characterizing the inevitable by-product of every such dispute as a 'taking' of private property." *Williamson, supra*, at 205 (opinion concurring in judgment).

The policy implications of today's decision are obvious and, I fear, far reaching. Cautious local officials and land-use planners may avoid taking any action that might later be challenged and thus give rise to a damages action. Much important regulation will never be enacted,[17] even perhaps in

---

[17] It is no answer to say that "[a]fter all, if a policeman must know the Constitution, then why not a planner?" *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621, 661, n. 26 (1981) (BRENNAN, J., dissenting). To begin with, the Court has repeatedly recognized that it itself cannot establish any objective rules to assess when a regulation becomes a taking. See *Hodel* v. *Irving*, 481 U. S. 704, 713–714 (1987); *Andrus* v. *Allard*, 444 U. S. 51, 65 (1979); *Penn Central*, 438 U. S., at 123–124. How then can it demand that land planners do any better? However confusing some of our criminal procedure cases may be, I do not believe they have been as open-ended and standardless as our regulatory takings cases are. As one commentator concluded: "The chaotic state of taking law makes it especially likely that availability of the damages remedy will induce land-use planning

the health and safety area. Were this result mandated by the Constitution, these serious implications would have to be ignored. But the loose cannon the Court fires today is not only unattached to the Constitution, but it also takes aim at a long line of precedents in the regulatory takings area. It would be the better part of valor simply to decide the case at hand instead of igniting the kind of litigation explosion that this decision will undoubtedly touch off.

I respectfully dissent.

---

officials to stay well back of the invisible line that they dare not cross." Johnson, Compensation for Invalid Land-Use Regulations, 15 Ga. L. Rev. 559, 594 (1981); see also Sallet, The Problem of Municipal Liability for Zoning and Land-Use Regulation, 31 Cath. U. L. Rev. 465, 478 (1982); *Charles* v. *Diamond,* 41 N. Y. 2d 318, 331–332, 360 N. E. 2d 1295, 1305 (1977); *Allen* v. *City and County of Honolulu,* 58 Haw. 432, 439, 571 P. 2d 328, 331 (1977).

Another critical distinction between police activity and land-use planning is that not every missed call by a policeman gives rise to civil liability; police officers enjoy individual immunity for actions taken in good faith. See *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982); *Davis* v. *Scherer,* 468 U. S. 183 (1984). Moreover, municipalities are not subject to civil liability for police officers' routine judgment errors. See *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978). In the land regulation context, however, I am afraid that any decision by a competent regulatory body may establish a "policy or custom" and give rise to liability after today.