[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
In this case the plaintiff wants to build a summer home on a spit of land in an extension of Ninigret Pond called Fort Neck Pond in the Town of Charlestown. In order to do so he requested the defendant's permission. On April 25, 1989 the defendant denied the plaintiff's request. The plaintiff seeks judicial review of the defendant's decision under G.L. 1956 (1988Reenactment) § 42-35-15.
I.
The land on which the plaintiff wants to build the home was parcelled off and conveyed to his wife in 1945. She in turn conveyed it to him on August 29, 1960. Apparently, because of its shape it is sometimes called Buttonhook Point. In the wider portion of this peninsula, where the plaintiff wants to build, it averages only 110 feet in width. There is only 40 feet between the tops of the banks on each side of the point. On this forty foot wide crest the plaintiff wants to locate his house and the supporting individual sewage disposal system (ISDS), a septic tank.
After getting zoning approval from the Town, approval for his ISDS from the Department of Environmental Management, and other administrative requirements, the plaintiff applied to the defendant on September 19, 1986 for an Assent and a special exception, "to build a residential dwelling, install an individual sewage disposal system and construct a compacted gravel driveway in a prohibited area." Based on the exhibits filed with the defendant's memorandum in this case, Section300.2.B.1 of the Rhode Island Coastal Resources ManagementPlan (RICRMP)[1] prohibits any filling on the coastal banks on the plaintiff's land, which is adjacent to Type 2 waters. The land is also classified as land of critical concern in Section320.1.B.1 of the Rhode Island Salt Pond Region Special AreaManagement Plan (SAMP). In addition, the defendant initially felt that the plaintiff's project implicated the prohibitions ofRICRMP Section 210.4.C.3.[2]
II.
While the plaintiff's application was pending his project was assessed by an engineer and biologists on the defendant's staff. On October 20, 1987, Nicholas Pisani filed an engineer's field report. He reported the following as the coastal feature of the parcel:
 "Shoreline consists of a narrow cobble/gravel beach which supports a fringe coastal wetland growth. The beach is (approximately) 5' to 8' (more or less) wide, and extends along the entire peninsula shoreline. Slightly larger areas of coastal wetland exist along the (southwest) shore of the peninsula. On both sides of peninsula, the narrow beach is immediately backed by a steeply sloping brush and tree (small trees) vegetated slope. Slopes of up to (approximately) 40% are present on the embankments extending up from both shores. Generally, slopes on the bank average (approximately) 30%."
He further reported the following distance of the proposed development to coastal features:
 "ISDS-related fill is proposed onto the coastal bank. Both dwelling and ISDS are at 50' or less to the waterway itself, less to top of bank. (Dwelling is within a few feet of bank crest)."
Based on his review of the plaintiff's proposal the staff engineer made the following "comments" as his recommendations:
 "Comments with respect to engineering concerns of the RICRMP:
 Re SAM-Salt Pond 320.1B — This area is located entirely within an area mapped as "critical concern". As this lot predated the SAM Plan, the 200' buffer zone requirement is not mandatory. The RICRMP now states "recommended buffer zones shall be established according to the values and sensitivites of the site as assessed by the council's staff engineer and biologist." This engineer holds that at least the minimum 50' vegetated setback from the top of coastal bank should be required.
 Re 140 — The location of the proposed dwelling does not meet the required minimum 50' setback to the coastal feature, and does not even meet 50' to the waterway.
 Re 210.4
 a — Filling and loss of tree cover on parts of the coastal bank may have an adverse impact on the feature, especially when it exposed to surface runoff.
 b — The slope which presently exists is considered to be too steep to allow filling. The vegetative cover of the coastal bank is a critical factor in potential water quality impacts.
 c — Presently, the site and vicinity support no development on the coastal bank.
 d — The bank is not a sediment source for beaches.
 e — The CRMC should assure that scenic concerns of disturbance to the coastal bank are addressed.
 Re 300.1 — 7 8 — The R.I. Salt Pond SAM Plan places a priority for amendments to local zoning plans to provide a minimum 2 acre lot size. The parcel involved is estimated by staff at just under one acre.
 The proposal involves the use of an incinerating toilet. The proposed use of this method on a year-round use dwelling is questionable, especially from an enforcement perspective."
 (Emphasis supplied).
Although the plaintiff argues with some merit that the engineer's comments do not expressly recommend denial of his request, the underlined portions of his "comments" refer to requirements of the RICRMP which cannot be satisfied by any modification of the plaintiff's proposed development of the land because of the configuration of the land itself. The concluding paragraphs of the engineer's recommendation provide that the applicant has not met "the required burdens of proof," but that, if the defendant should decide to the contrary, or if the plaintiff should modify his proposal to meet the burdens, then the staff will prepare stipulations based on engineering concerns. The Court accepts the arguments of both the defendant and the plaintiff that the recommendations of the staff engineer were not conclusive but were subject to rebuttal at a hearing. The Court accepts the defendant's argument that these comments and observations were part of the record before the defendant upon which it was entitled to base its decision. See R.I.G.L. 1956 (1988Reenactment) § 46-23-14.
The engineer did review the plaintiff's request for a special exception under RICRMP Section 130. Even a glance at that Section is sufficient to see that there was no way possible for this plaintiff to qualify for such an exception to the provisions of the RICRMP. There was no conceivable way that the plaintiff's proposed activity served any public purpose, let alone a compelling public purpose specified in the Section.[3]
On October 19, 1987 the staff biologists prepared a report which they updated on December 7 of that year. The biologists reported on impact to the marine, terrestrial and avian flora and fauna in and around the land sought to be developed. They observed at least one endangered species (diamond-backed terrapin) in Ninigret Pond. They reported: "Peninsula is valuable to many species in its natural state." (Emphasis supplied).
The biologists made several comments regarding the plaintiff's proposed developments. They found that the proposal would "impact wildlife values and vegetated coastal banks," which would be grounds for denial of a variance under RICRMP Section120. They concurred with the engineer's finding that the configuration of the land did not allow compliance with the setback requirements of RICRMP Section 140, nor did it allow an adequate buffer zone under RICRMP Section 150 to meet biological concerns. They found that the proposal would adversely affect coastal scenic values. They noted that the development would reduce wildlife diversity on the site and in surrounding water and wetlands areas. They concurred with the engineer's finding that the plaintiff proposed to violate the prohibition against coastal filling in RICRMP Section 300.2.B.1. The potential for environmental contamination from gasoline, fuel oil, septic tank cleaners, herbicides and pesticides, as well as nutrient enrichment and bacteria, and other such pollutants which result from human occupancy, were of concern to the biologists. Again and again in their report the biologists stressed the need for an adequate buffer zone to protect natural habitat and scenic values.
The biologists' conclusions show that no development of this land is possible under the goals and policies of theRICRMP. They found:
 "This project has a great potential to impact biological values of the site and surrounding upland and wetland areas. The septic system cannot be guaranteed to function adequately without continuous testing during its life span and any malfunction would only add to the cumulative impacts on this estuary.
 This investigator does not believe that any form of development can be biologically justified on this particular site.
 This project is proposed for property located in lands of critical concern (SAMP).
 If the legislation shall apply, a 200 foot buffer is required.
 150 feet is the minimum acceptable buffer to address biological concerns for this project.
 Thus the peninsula is not of adequate size to allow completion of this project."
 (Emphasis supplied.)
Like the engineer, the biologists were prepared to present stipulations to condition any assent granted by the defendant, if it were to reject their findings. Also, as was the case with the engineer's report, the biologists did not expressly recommend that the defendant deny the plaintiff's application. The plaintiff, nevertheless, could not possibly have believed that these reports pointed the way to any favorable result. This Court cannot accept the plaintiff's contention that these findings were a "routine opportunity for Applicant to get additional expert testimony on the record that will meet the required burdens of proof." Plaintiff's Reply to Defendant's Memorandum, filed March 20, 1991, p. 2. No expert could change the dimensions of the plaintiff's lot. No expert could place a structure anywhere on plaintiff's land set back at least 50 feet from the coastal banks. No expert could place a buffer zone of any significant width between the shore and the plaintiff's development, let alone the 150 feet required by the biologists, or the 200 feet provided in the SAMP.
III.
What the plaintiff chose to do was to go to hearing before a subcommittee of the defendant to prove that his development would not have "a reasonable probability of causing or accelerating erosion or degrading a generally recognized scenic vista," as prohibited by RICRMP Section 210.4.C.3. He also proposed to present evidence in support of his application for a special exception under Section 130 for a public purpose use, which he could not seriously have expected to have been granted. The plaintiff also, of course, intended to prove that he was entitled to permission to proceed with the proposed construction under applicable Plans (RICRMP and SAMP).
Hearing on the plaintiff's application was held on January 29, 1988 before a subcommittee consisting of three members of the defendant pursuant to G.L. 1956 (1988 Reenactment) § 46-23-20.
The subcommittee was chaired by Mr. John Lyons. The reports of the engineer and the biologists were made part of the record of the proceeding.
The first witness called by the plaintiff was Arthur Hayward, a qualified land surveyor, but not a licensed professional engineer. He generally described the peninsula and the layout of the proposed house and septic tank. He contended that no part of the structure or the septic system would extend over the coastal bank. He did testify that the plaintiff proposed to put a 24-foot-wide house on a forty-foot wide crest between the banks, leaving approximately an 8-foot shelf between the dwelling and the banks. He also acknowledged that the septic area, as laid out, would extend an area of fill over the coastal bank, but reducing the 25-foot perimeter around the septic tank could eliminate the filling. The witness acknowledged that he had never built a dwelling on a piece of land as narrow as the plaintiff's parcel between the crests of coastal banks. The septic system itself was approved by the Department of Environmental Management. The witness attempted to explain that it would be possible to enforce the restrictions on the septic system to insure protection of water quality in the area. It was his opinion that "what we're proposing to do will not have an adverse effect upon the site or upon the coastal waters." He agreed that it was impossible to build with a 50-foot setback from the crest of the coastal banks. He gave his opinion that the construction created no reasonable probability of erosion from surface runoff, and would not be a source of sediment to the surrounding beaches. He implied that the project would not adversely impact scenic values because of other residential units in plain view around the pond. Of course, it was impossible to comply with a 2-acre lot size requirement. It was also his opinion that the natural buffers resulting from the development of the plaintiff's proposal, however small, would be sufficient to meet the purposes of establishing such buffer zones. In a striking example of professional testimonial candor the witness acknowledged that the reports of the defendant's professional staff had merit, but that he simply disagreed with them.
The penultimate comment from this witness about this peninsula sums up the scenic value of the view from the site in its undisturbed natural condition. Said he, "I've been on that peninsula a number of times and the view as it is in its present condition is gorgeous . . ." Thereby is capsulized the conflict in this case. The private interest is the "gorgeous" view from
the site; the public interest is the view of the site.
The plaintiff called as his next witness at the hearing Mr. David Lord, who was qualified as a soil conservation expert. He testified that he had visited the site on January 13, 1988. He described the soil and vegetative cover, including trees and shrubs. The upland was covered by large oaks and maples. The slopes bore younger oaks and other stabilizing shrubs almost down to the water line. The soil cover was described by him as "hinkley with a gravelly, sandy type soil." The topsoil is gravelly, sandy loam. He acknowledged that hinkley soil with the type of slope found on this site has a severe hazard for soil erosion and sedimentation if the slopes are unprotected as a result of disturbance of vegetation or if they receive concentrated runoff. It was his opinion that there was no risk of erosion on the banks of this land if recommended protective measures were taken during construction. Based on the assumption that there would be no disturbance of stabilizing vegetation on the slope from construction of the plaintiff's project, it was his opinion that there wouldn't be any erosion or sedimentation problems with construction of the site. Even though they were "extremely small," the buffer zones proposed by the plaintiff around his construction were sufficient from an erosion and sedimentation control standpoint according to the witness.
In their examination of this witness, as well as Mr. Hayward, members of the subcommittee demonstrated grave concern about the inadequacy of the eight-foot wide buffer around the construction site, during construction and thereafter. They also displayed marked concern that a lack of prescribed setback would diminish the scenic value of the site, even though there were other residences bordering the pond. The witness was specifically asked by a member of the hearing subcommittee: "Do you think by granting this application we'll be contributing to that goal (of preserving scenic and ecological values of coastal banks) or diminishing it?" The witness' response suggested that the use proposed was consistent with other land use in the area. The implication of that response can only be that, since other past development has already so deteriorated the scenic and ecological value of the coastal banks in the area, one more can't hurt very much.
The plaintiff next called Keith K. Monroe who qualified as an expert appraiser of real estate values. He valued the property at $185,000. The witness testified that if the lot was unbuildable the value would depreciate by 75 to 80 percent. The value would then be in the range of $37,000 to $46,250.
Mr. Walter F. Bohlen qualified as an expert in marine water quality, pollution and sediment. He assessed the plaintiff's project for potential contamination of adjacent waterways and Ninigret Pond in particular. It was his opinion that the safeguards described by the witnesses, Mr. Hayward and Mr. Lord, would be sufficient to control runoff of sediment from the construction site to adjacent waterways, with proper supervision. It was his opinion that the proposed sewage disposal system was adequate to maintain ground water standards around the site. Taken together, both of these opinions result in a conclusion that the proposed construction would not adversely impact on the water of Ninigret Pond. He limited his opinion as to the adequacy of the narrow buffer zones to the standpoint of sediment transport. He also testified, however, with respect to the staff reports that, "my view of the system and the engineer and biologist's view of the system are relatively consistent and that the comments that I saw in those two reports were certainly
site specific rather than general."
Mr. George Bockstael qualified as an expert in the field of biology and environmental science. He showed a videotape of the north and south shoreline of Ninigret Pond. It was his opinion that the proposed development would not have any significant impact on the fringe marsh around the site, nor any kind of impact on fresh water wetlands and marshes on the other side of Arnolda Road. The witness testified that construction would not disturb natural animal wildlife any more than did the power boats already operating in the pond. He also did not see any additional biological impact on wildlife on the peninsula or the wetlands across the road from human activity after construction. His opinion was that, if the septic system functioned as designed and if restrictive conditions were enforced, it would not impact on water quality. The witness disagreed with the staff biologists' conclusions that no development could be biologically justified on the site.
IV.
After the hearing, but before the subcommittee made its recommendation to the full council, counsel for the plaintiff, and the defendant's chairman, Dr. William Miner, who had been a member of the subcommittee, met with the defendant's staff engineer and biologist on March 15, 1988. The next day Dr. Miner wrote to plaintiff's counsel setting out 19 stipulations which would be "recommended to the full council (CRMC) for the Miller Application . . ." Thereupon the plaintiff changed the site plan by relocating the proposed dwelling and ISDS to conform to the proposed stipulations. In the summer of 1988, Mr. Walter B. Mahony, Jr., a friend of the plaintiff, attempted to intervene in the formulation of stipulations, requesting that the plaintiff be permitted to erect a three-bedroom dwelling instead of a two-bedroom and that he be permitted to install a dishwasher and a laundry washer. In the meantime, Dr. Miner left the defendant and a new chairman, Mr. George DiMuro, succeeded him. On September 22, 1988, counsel for the defendant advised Mr. Mahony that, "Stipulations 2 9 of the assent are in conformance with the Coastal Resources Management Plan which is rooted in state law." On November 9, 1988 counsel for the plaintiff submitted to the chairman of the hearing subcommittee, Mr. John Lyons, a proposed Declaration of Restrictions in compliance with the stipulations in Dr. Miner's letter of March 16, 1988. He renewed a request that the defendant relieve the plaintiff of the burden of stipulations number 2 and 9.
Throughout 1988 plaintiff's counsel had been led to believe that his application would be granted with 19 stipulations. He contends that he found an unsigned subcommittee recommendation of approval in the plaintiff's file in the defendant's offices. A hearing before the full council was scheduled on January 24, 1989 and postponed to February 28, 1989, at which time the plaintiff was heard by the full council. At the hearing plaintiff presented evidence pertaining to the transactions between the plaintiff and Dr. Miner and the defendant's staff.
At the hearing the defendant had before it a recommendation of the hearing subcommittee for denial of the plaintiff's application. The record of the defendant in this proceeding, as certified to this Court, does contain an unsigned and undated subcommittee recommendation of denial. The recommendation contains the same findings of fact as the unsigned recommendation for approval with stipulations alleged by the plaintiff to have been in the council file.
The Chairman ruled that the recommendation for approval with stipulations was a proposed draft by the former chairman, Dr. Miner. It was never approved by the other members of the subcommittee. The chair ruled that the final recommendation of the subcommittee was for denial. Transcript, Coastal ResourcesManagement Council, Semi-monthly Meeting, February 28, 1989,
p. 108.
It is noteworthy at this juncture that neither party raises any issue as to whether the conferences with Dr. Miner or the formulation of the final recommendation of the hearing subcommittee were lawful under Chapter 46 of Title 42 of theGeneral Laws, requiring all public bodies, or their subdivisions, to conduct their business publicly in open meetings with notice to the public, agendas, records and minutes. There is nothing in the record to show that the subcommittee deliberated, formulated its findings of fact, and rendered its recommendation at an open meeting. The plaintiff, of course, seeks to rely on its private "conferences" with a member of the hearing body and the defendant wants to rely on the results of a secret meeting of the subcommittee.
At the meeting on February 28, 1989 the defendant voted to deny the plaintiff's application, but without giving any reasons for its denial. It is inferable that the defendant really voted to approve the recommended decision of its subcommittee and to adopt as its own the subcommittee's findings of fact. Nevertheless, it was not until April 24, 1989 that the defendant issued its decision through its chairman. There is no explanation in the record for the two-month delay.
V.
The defendant's decision contains eight separately numbered findings of fact and an unnumbered conclusion of fact. In addition, there are three numbered conclusions of law and a decision. It is so ill-drafted as to be almost unreviewable under§ 42-35-15. The first three findings set forth important but undisputed facts, which locate the site in an area of critical concern in accordance with the appropriate plan (the SAMP). Finding number 4 also states an undisputed fact: the location of the proposed dwelling does not meet a required minimum 50-foot setback to the coastal feature or even the waterway, itself. This finding might well be dispositive standing alone, were it not obvious that the plaintiff was seeking a variance from that requirement under RICRMP Section 120. The defendant may not permit any variance unless five criteria are met.[4]
Finding number 5 states accurately that the staff engineer considered the existing slope of the coastal bank to be too steep to allow filling. It also finds that vegetative cover on the coastal bank is a critical factor in the potential water quality impacts. While the finding is accurate enough, it does not fairly address the issue presented. The plaintiff claims he will not fill on the coastal bank and will not strip vegetative cover from the coastal bank, or that, to the extent he does, he will minimize, if not eliminate any adverse impact. As has already been pointed out above, however, the staff engineer's report is rich with findings, which, if adopted by the defendant, would be sufficient to justify denial of this application. A liberal reading of the very terse finding number 6 that the applicant had not met his burden of proof would support the conclusion that the defendant was accepting and adopting the findings of the staff engineer as its own.
Finding number 7 simply states that the staff biologist expressed over twenty concerns in his report as submitted. Read liberally, however, this finding could also constitute an approval and adoption of the biologist's findings. This finding and finding number 6, taken together and with a liberal meaning adequately support the defendant's factual conclusion that the "proposed activity will detrimentally impact on the coastal resources of this State." In effect, this conclusion of fact is a finding that the plaintiff here has failed to satisfy criteria (1) and (2) of Section 120.
Finding number 8 is contrary to all the evidence before the sub-committee, and is obviously the product of careless draftsmanship.
The plaintiff argues on appeal that at the hearing before the subcommittee he presented uncontradicted and unrebutted evidence from qualified experts that all of the environmental concerns expressed in the staff reports were unfounded. He says that his expert witnesses demonstrated conclusively the proposed project specifically addressed each such item and showed that there would be no adverse environmental impacts or use conflicts and that his project conformed with all the RICRMP goals and policies. He further demonstrated, he says, an undue hardship from the application of the impossible setback or buffer zone requirements. He points out that, although they were present at the subcommittee hearing, no members of the defendant's staff offered to rebut any of the opinions of his experts.
This Court may not substitute its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact. Costa v.Registrar of Motor Vehicles, 543 A.2d 1307 (R.I. 1988). Nevertheless, an administrative decision may be vacated if it is clearly erroneous in view of the reliable, probative and substantial evidence contained in the whole record. Id.;Newport Shipyard, Inc. v. Rhode Island Commission for HumanRights, 484 A.2d 893 (R.I. 1984).
This Court has read the record and the memoranda of the parties with great care. There is competent credible evidence both ways on the issue of whether or not the plaintiff's project will create a significant risk of an adverse impact on the environmental, ecological and scenic coastal values the defendant is charged to protect. If this Court were sitting as an independent fact-finder weighing this evidence on its own, it might well come to a different conclusion from that of the defendant. This Court might well have accepted the conclusions of the plaintiff's experts and approved the application with highly restrictive stipulations. In order to do so, however, this Court would be required to substitute its judgment for the agency on disputed fact issues.
In this case the agency was called upon to decide the future impact of proposed activities. It was not, as is the Court in many instances, trying to decide the future impact of accomplished activities, or of already established situations, with demonstrated historic impact. The agency had to weigh both the impact, if any, of the proposed activity, and the likelihood that the proposed activity would be carried out as planned if restrictions were imposed. Given a choice between the pessimistic predictions of its staff and the optimistic ones of the plaintiff's experts the agency cannot be faulted for declining to subject the public to the risk of expert error. Cf. Costa v.Registrar, supra.
Since the defendant's decision is supported by substantial evidence in the record, it is neither clearly erroneous nor is it arbitrary or capricious.
VI.
The Court has found the decision's fact-finding to be minimally sufficient for judicial review. The Supreme Court opinion and holding in Sakonnet Rogers, Inc. v. CoastalResources Management Council, 536 A.2d 893 (R.I. 1988), therefore does not apply. None of the council's findings in that case can be fairly read to imply that it had accepted or adopted staff opinions of significant adverse impact on values the council is mandated to protect. In addition, it was clear to the Supreme Court in Sakonnet Rogers, Inc., supra, that the council had relied on irrelevant matters to deny the application. That meant it had overlooked or misconceived the applicant's relevant evidence. In this case, based on the hearing record of the full council on February 28, 1989, it is clear that the defendant did not overlook or misconceive the plaintiff's evidence; it rejected it in favor of the evidence of its staff experts. Ratcliffe v. Coastal Resources Management Council,584 A.2d 1107 (R.I. 1991) does not aid this plaintiff. In theRatcliffe assent what was missing was an express finding of a reasonable probability of damage to the coastal environment by virtue of the applicant's proposed construction. In this case, the council has found as fact that the proposed activity will, not may probably, detrimentally impact on the coastal resources of the State. Accordingly, the defendant's decision is not unreviewable for lack of fact-finding adequate to discern the factual basis for the defendant's decision.
VII.
However much the Court may sympathize with the plaintiff's frustration with his treatment at the hands of the defendant's former chairman, the facts do not justify the invocation of any estoppel doctrine. Although the plaintiff did incur some expense in modifying his proposal to conform to the stipulations he had every reason to believe would be the conditions imposed on an official approval of his request, he did not so far rely to his detriment on an official act as to bind a governmental agency. This Court has no evidence before it upon which to rule as to how much additional expense the plaintiff incurred in the nature of expert witness fees, legal fees, engineering and architectural fees as well as carrying costs for the project. Also, of course, the communication from the chairman to the plaintiff's counsel on March 16, 1988 did not purport to commit the defendant to approve the plaintiff's application. All that was involved was the proposed recommendation of the hearing subcommittee. Cf.Greenwich Bay Yacht Basin Associates v. Brown, 537 A. 988, 991-92 (R.I. 1988). No matter how reprehensible it may have been for a member of a hearing subcommittee to discuss a proposed recommendation with an applicant in the absence of the other members of the subcommittee and not in an open public session, as required by law, the plaintiff was not entitled to rely, and knew he could not rely on his communication with the member as final authority to proceed with his proposal. The doctrine of equitable estoppel does not apply on the facts of this case.
VIII.
If all there was to this case was a decision that there is substantial evidence supporting the defendant's decision and that the plaintiff was fairly heard, this case would be at an end. It is not. Remaining to be considered are the plaintiff's constitutional arguments. Because the council did not expressly balance his ownership rights against the impact of his proposed development on ecological systems he claims he was denied due process. He also contends that the council's decision denied him substantially of all beneficial use of his land, and, so, it is an unconstitutional taking. Alternatively, he argues that the decision of the council must be reversed or he be awarded damages for inverse condemnation, citing Annicelli v. Town of SouthKingstown, 463 A.2d 133 (R.I. 1983).
Since the council's denial of the plaintiff's proposed development can be sustained administratively by holding that the council, as fact-finder rejected the opinions of the plaintiff's experts and accepted those of its staff, the council must have agreed with its staff's conclusions that the plaintiff's land could support no development at all. Put another way, it is obvious, taking the reports of the staff engineer and biologists as a whole and reading them fairly, that any development at all of this land will so significantly impact the environmental and scenic values of this State's coastal zone that it must be utterly prohibited. If the plaintiff's experts are so totally rejected that even the stringent stipulations recommended by the defendant's former chairman will not adequately minimize any such impact, it doesn't appear to be much more that the plaintiff can do with his land except to walk barefoot on it now and then, so long as he doesn't scare the terrapins.
It is to avoid just such drastic regulation that council has provided in its own rules that it must weigh and consider a landowner's property rights when it applies its regulatory standards in furtherance of its goals and policies, however desirable they may be. For example in an amendment to SAMPSection 320.1.B.3 (effective June 21, 1987) pertaining to lots platted before the adoption of the Plan, which cannot sustain the required 200-foot natural buffer zone in those areas that abut salt ponds, like Ninigret Pond, "the determination of the boundaries of a buffer zone must balance the property owner's rights to enjoy their (sic) property with (the) council's responsibility to preserve, and where possible, restore ecological systems." RICRMP Section 150 B. also requires that the boundaries of any buffer zone established for a site by the council's staff engineer and biologist must be similarly the product of such a balancing. RICRMP Section 120 regarding variances plainly implies that a landowner's hardship caused by the strict application of a plan standard must be weighed against the environmental impact of a deviation from that standard. This provision parallels the variance provision required in every local zoning ordinance to preserve its constitutionality.Reynolds v. Zoning Board of Review of Lincoln, 96 R.I. 340, 342 (1963).
General Laws 1956 (1988 Reenactment) § 42-35-15(g)(1)
expressly confers jurisdiction on this Court to reverse or modify the decision of an administrative agency, "In violation of constitutional or statutory provisions." This Court is satisfied beyond peradventure of a doubt that the decision of the council denying the plaintiff's application for minimal development without consideration of any stipulations, such as those suggested by its former chairman, confiscates the plaintiff's land without compensation. This Court is nevertheless satisfied that the council had a statutory authority to reject any "design, location, construction, alteration and operation" of any land uses "when these are related to a water area" under the council's jurisdiction where there is "a reasonable probability of conflict with a plan or program for resources management or damage to the coastal environment." G.L. 1956 (1988 Reenactment) §46-23-6(B)(3). The council is also authorized to "issue, modify or deny permits (which it calls "assents") for any work in, above, or beneath the areas under its jurisdiction . . ." §46-23-6(D)(2). The defendant clearly did not violate any statutory provision.
Article I, Section 16 of the Constitution of the Stateof Rhode Island, as adopted by the people of the State, has provided since 1986:
 "The powers of the State and of its municipalities to regulate and control the use of land and waters in the furtherance of the preservation, regeneration and restoration of the natural environment, and in furtherance of the protection of the rights of the people to enjoy and freely exercise the rights of fishery and the privileges of the shore, as those rights and duties are set forth in Section 17, shall be an exercise of the police powers of the state, shall be liberally construed, and shall not be deemed to be a public use of private property." (Emphasis supplied.)
Since this Court has found that there was a factual basis for the regulatory activity of the council "in the furtherance of the preservation, regeneration and restoration of the natural environment," the council's exercise of that power may not be deemed a public use of private property requiring "just compensation" under Article I, Section 16, even if confiscatory.
The Just Compensation Clause of the Fifth Amendment to the United States Constitution was incorporated into the Due Process Clause of the Fourteenth and, accordingly applies to this State.Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). In Annicelli, supra, the Supreme Court of this State recognized the existence of a claim for damages for inverse condemnation for victims of confiscatory regulation. According to the U.S. Supreme Court that claim is deriveddirectly from and founded upon the Constitution of the United States and requires no legislative intervention. First EnglishEvangelical Lutheran Church of Glendale v. County of LosAngeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250, 264 (1987).
Judicial review of an administration decision under § 45-35-15 has been held to be an inappropriate proceeding for a claim for inverse condemnation damages. Milardo v. CRMC,434 A.2d 266, 270 (R.I. 1981). When the question of relief for inverse condemnation came before the Supreme Court again afterMilardo, supra, in Landfill Resource Recovery, Inc. v.Department of Environmental Management, 512 A.2d 866 (R.I. 1986), the General Assembly had provided a condemnation-like proceeding for the taking alleged in that case under what is nowG.L. 1956 (1989 Reenactment) § 23-18.9-9.1(g), and so once again a regulated landowner was left to seek relief in an appropriate proceeding.
Accordingly, since the Fifth Amendment does not prohibit confiscatory regulation as an unconstitutional taking, but conditions such action on the payment of Just Compensation the council's decision does not violate any Federal constitutional provision. The plaintiff is entitled to bring an Annicelli
claim in an appropriate proceeding against the State, thereby satisfying the condition of just compensation under the Fifth and Fourteenth Amendments to the Constitution of the United States.
The decision of the defendant is affirmed. The plaintiff's appeal is denied and dismissed.
The defendant will present a form of judgment for entry after notice to the plaintiff.
FOOTNOTES
[1] "Filling, removing, or grading is prohibited on beaches, dunes, undeveloped barrier beaches, coastal wetlands, cliffs and banks, and rocky shores adjacent to Type 1 and 2 waters unless the primary purpose of the alteration is to preserve or enhance the feature as a conservation area or natural buffer against storms."
[2] On shorelines adjacent to Type 1 and 2 waters, the Council shall prohibit construction on or alteration of coastal cliffs, bluffs, and banks and contiguous areas where such construction or alteration has a reasonable probability of causing or accelerating erosion or degrading a generally recognized scenic vista. The Council shall require suitable unaltered buffer zones on cliffs, bluffs, or banks where erosion or substrate stability can be affected by facility construction or use.
In determining whether a reasonable probability exists that increased erosion or loss of scenic values will result from the proposed construction or alteration, the Council shall consider the following:
(a) the exposure of the feature to the erosional forces of tidal currents, storm waves and flooding, wind and surface runoff, and other such natural processes;
(b) the composition of the feature involved as well as it slope, stratigraphy, height, exposure, and vegetative cover;
(c) existing types and levels of use and alteration;
(d) competent geological evidence to evaluate whether natural erosion of the feature in question is a significant source of sediments to nearby beaches and whether the proposed construction or alteration will substantially reduce that source of sediment; and
(e) inclusion of the feature on an accepted inventory of significant scenic or natural areas or evidence of public use and enjoyment as a scenic or natural area."
[3] "Special exceptions may be granted to prohibited activities to permit alterations and activities that do not conform with a Council goal for the areas affected or which would otherwise be prohibited by the requirements of this document only if and when the applicant has demonstrated that:
(1) The proposed activity serves a compelling public purpose which provides benefits to the public as a whole as opposed to individual or private interests. The activity must be one or more of the following: (a) an activity associated with public infrastructure such as utility, energy, communications, transportation facilities; (b) a water-dependent activity that generates substantial economic gain to the state; and/or (c) an activity that provides access to the shore for broad segments of the public.
(2) All reasonable steps shall be taken to minimize environmental impacts and/or use conflict.
(3) There is no reasonable alternative means of, or location for, serving the compelling public purpose cited."
[4] "Applicants desiring a variance from a standard shall be granted an Assent only if the Council finds that the following five criteria are met:
(1) The proposed alteration conforms with applicable goals and policies in Parts Two and Three.
(2) The proposed alteration will not result in significant adverse environmental impacts or use conflicts.
(3) Due to conditions at the site in question, the standard will cause the applicant an undue hardship.
(4) The modification requested by the applicant is the minimum necessary to relieve an undue hardship.
(5) The undue hardship is not the result of any prior action of the applicant."