# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 9, 2003 Session

## STS/BAC JOINT VENTURE v. THE CITY OF MT. JULIET, TENNESSEE ET AL.

**Appeal from the Chancery Court for Wilson County**
**No. 99205     Charles K. Smith, Chancellor**

---

**No. M2003-00171-COA-R3-CV - Filed December 1, 2004**

---

The developer of a planned Wilson County subdivision sought damages for a temporary taking, claiming that the City of Mt. Juliet interfered with the completion of the project by arbitrarily refusing to grant necessary permits. The trial court granted summary judgment to Mt. Juliet, in part on the ground that the statute of limitations had passed on the developer's claim for relief. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN, and FRANK G. CLEMENT JR., JJ., joined.

George A. Dean, Nashville, Tennessee, for the appellant, STS/BAC Joint Venture.

John E. Quinn, Douglas B. Janney III, Nashville, Tennessee, for the appellees, The City of Mt. Juliet, Tennessee and the Mt. Juliet Planning Commission.

## OPINION

This case began when the developer of a subdivision filed a complaint on May 26, 1999, against the city of Mt. Juliet[1] alleging, *inter alia*, that the city, through its planning commission, had arbitrarily and illegally denied approvals for further development of the project, thereby depriving the developer of beneficial use of his property in violation of the takings clauses of both the United States Constitution and the Tennessee Constitution. The developer alleged that from late 1995 or early 1996, the city either denied applications for permits or delayed action on such applications.

---

[1]The Mt. Juliet Planning Commission was later added as a defendant.

The case was eventually dismissed by final order granting the city's motion for summary judgment and the commission's motion to dismiss. In that order the trial court held, "Specifically, the Court finds that Plaintiff's claims against Defendants are barred by the statute of limitations and applicable law."

## I. A PLANNED SUBDIVISION

The property in dispute is a 240-250 acre tract of land in Wilson County which Nashville Land Partners acquired for the purpose of creating a large residential development to be completed in phases.[2] The plan was to divide the property, called the Park Glen subdivision, into 740 separate lots, to be serviced by a new infrastructure of roads and utilities. A preliminary subdivision plan was presented to the Wilson County Planning Commission and approved on May 14, 1987.

At the time of the approval and thereafter, Wilson County had a subdivision regulation that stated, "approval of the preliminary plat shall lapse unless a final plat based thereon is submitted within one-year from the date of such approval. . . ." Another regulation in effect made it clear that "approval of the preliminary plat by the Planning Commission shall not constitute acceptance of the final plat."

Nashville Land Partners asked the City of Mt. Juliet to extend its sanitary sewer system to Park Glen. On July 13, 1987, Nashville Land Partners and the Mt. Juliet Sewer Board signed an agreement allocating the costs and obligations of the sewer extensions between the parties. The owner also urged the City of Mt. Juliet to annex the subdivision property. On November 10, 1987, Danny Farmer, Mt Juliet's City Manager wrote a brief letter to Nashville Land Partners that read:

> The policy of the City of Mt. Juliet, in regard to the annexation of the above referenced subdivision into the city, is that it will be allowed to conform to the current Wilson County zoning since the preliminary plot (sic) has been approved by the Wilson County Planning Commission and work has commenced on the project.

The legal effect of that letter became a point of contention between the parties.[3] In November of 1987, the subdivision property was annexed by the city, transferring authority over the subdivision to the Mt. Juliet Planning Commission. At the time of the annexation, Mt. Juliet, like Wilson County, had a subdivision regulation providing that if a final plat for a subdivision that has received preliminary approval is not submitted within twelve months of the preliminary plat approval, then the preliminary plat is null and void and must be resubmitted for preliminary approval again. A final plat was submitted to the Wilson County Planning Commission, but was denied by that commission

---

[2] The relevant facts are taken from filings made in support of and opposition to dispositive motions filed by all parties at various times.

[3] The City Manager's affidavit stated that his letter referred only to the Wilson County zoning regulations, not to all of Wilson County's land use regulations.

on November 12, 1987. Within one year of the May 1987 approval of Park Glen's preliminary plat, Nashville Land Partners submitted a final plat for some phases or sections of the subdivision, and approval for those plats was granted by the Mt. Juliet Planning Commission since annexation had occurred. Much of the subdivision was not covered by these final plats. No final plat for the remainder of the subdivision was ever submitted to the Mt. Juliet Planning Commission by Nashville Land Partners.

Nashville Land Partners defaulted on its obligations, and its lender was placed into receivership, with the Federal Deposit Insurance Corporation seizing its assets in 1991. A joint venture called STS/BAC ("developer")[4] purchased the disputed property in a December 1993 foreclosure sale.[5] By that time, the property consisted of 47 platted and developed lots in Sections 1, 2, and 3 of the subdivision, and additional unplatted acreage.

At some point after the purchase, STS/BAC began efforts to develop more of Park Glen. By letter dated March 31, 1995, the city informed STS/BAC that the commission had not approved a preliminary plan for Phase II, Sections 1 and 2 of Park Glen Subdivision. The letter continued, "Based on your discussion with the Commission on March 16, 1995, a new preliminary plan must be submitted and approved by the Planning Commission."

The developer placed on the agenda for the April 1995 commission meeting the original 1987 preliminary plat for Park Glen subdivision for preliminary approval, but withdrew it after staff indicated it would recommend against approval because of noncompliance with commission requirements regarding a concept plan.

In May of 1995, STS/BAC submitted for preliminary approval a section of the Park Glen subdivision (Lots 82-132 in Section 3). Preliminary approval was granted by the commission and on November 30, 1995, final approval for specified lots covered by that preliminary plat was granted.

Prior to the commission's June 27, 1996, meeting, the developer requested approval of a concept plan, but did not submit a preliminary plat for the subdivision. The next activity reflected in the record was a commission meeting on January 15, 1998, wherein the developer told the commission it was the developer's position that no new preliminary subdivision plat had to be submitted for approval because of the 1987 approval by the Wilson County Planning Commission. Based upon an opinion from counsel, the city engineer again took the position that the approval granted by the Wilson County Planning Commission had lapsed one year later. The commission continued to adhere to its interpretation of the regulation, to conclude there was no valid preliminary plat, and to require that the developer submit a new preliminary plat for the subdivision as a whole.

---

[4]The members of the joint venture are the Nashville Corporation, Inc. and an individual named Brent Campbell.

[5]Apparently STS/BAC initially took the position it had only purchased lots, not the development, which was relevant to responsibility for infrastructure.

The minutes of the July 16, 1998 meeting of the Commission reflect that the developer appeared and stated he had submitted a preliminary plat for another section of Park Glen and requested it be placed on the agenda. Again, Commission staff reiterated its position that the developer must submit an preliminary plat for the subdivision as a whole as a prerequisite to any further development of Park Glen. The developer again argued that the 1987 approval of the preliminary plat was still effective and no new preliminary plat was required.

According to affidavits dated August of 2000, at that point there had been no other efforts by the developer to obtain commission approval for further development of the subdivision. No preliminary plat for the subdivision as a whole had been submitted. The subdivision had been developed to the extent permitted by approved and recorded plats.

When the developer filed this action in May of 1999, it alleged that after late 1995 or early 1996, construction on the development came to a halt because the developer was unable to obtain necessary approval for additional plans and permits from the Mt. Juliet Regional Planning Commission. While the litigation was pending, approvals for further development were given in 2001.[6] At the time of the final judgment, the only issue before the trial court was whether the developer's claims to compensatory damages for a temporary taking[7] of its property prior to 2001 should be dismissed on substantive or statute of limitations grounds.

## II. THE LAW OF GOVERNMENTAL TAKINGS

The developer's complaint was brought pursuant to 42 U.S.C. § 1983 and characterized Mt. Juliet's refusal to grant the requested permits as arbitrary and capricious actions that worked a taking (a temporary taking in view of eventual approval) of the developer's property without just compensation, in violation of the both the Tennessee and United States Constitutions. The complaint sought $ 2 million in compensatory damages and attorneys' fees in accordance with 42 U.S.C. § 1988. Because the trial court dismissed the complaint under either, or both, applicable substantive law and statute of limitations grounds, some discussion of the law of regulatory takings is necessary.

The second clause of the Fifth Amendment to the United States Constitution, called the Takings Clause or the Just Compensation Clause, provides "nor shall private property be taken for

---

[6]As a consequence, some of the claims and requests for relief included in the complaint were rendered moot, leaving only the takings claim at issue. *SCA Chemical Waste Services, Inc. v. Konigsberg*, 636 S.W.2d 430 (Tenn. 1982) (holding that where clean air permit was issued after appeal perfected, the action was moot as to request for order to issue permit).

[7]Government action that denies a landowner all use of his property for a period of time, if such action is determined to be a taking, is compensable. *First English Evangelical Church of Glendale v. Co. Los Angeles,* 482 U.S. 304, 304, 107 S. Ct. 2378, 2388 (1987) (holding "where the government's actions have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.")

public use, without just compensation." This clause is predicated on the proposition that the government should pay for private property it has taken for its own use. Its purpose is to prevent the government from forcing an individual or group of individuals alone to bear burdens "which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S. Ct. 2448, 2457-58 (2001); *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563 (1960).

The Takings Clause of the United States Constitution was generally understood to apply only to physical takings until the United States Supreme Court held in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158 (1922) that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." The Court did not then, and has not since, established a formula for determining when regulation "goes too far." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 326-37, 122 S. Ct. 1465, 1481 (2002). Instead, the Court has consistently held that in cases involving regulatory takings, examination of multiple factors is necessary. *Id.* Where the allegation is one of regulatory taking, neither public use nor physical appropriation of the land is required. *Id.*, 535 U.S. at 326, 122 S. Ct. at 1481.

The one exception to the general balancing of factors approach is where a governmental regulatory action permanently eliminates all economic value from an entire piece of property by prohibiting all economically beneficial use. In that situation, a "per se" taking has occurred, and "total regulatory takings" must be compensated unless the government can show that the proscribed uses were not part of the owner's interests under state property and nuisance law. *Tahoe-Sierra Preservation Council*, 535 U.S. at 324 n.19, 332, 122 S. Ct. at 1479 n.19, 1484; *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 2895 (1992) (holding "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.")

Absent a total taking, the analysis established in *Penn Cent. Transp. Co. v. New York City*, 438 U. S. 104, 98 S. Ct. 2646 (1978), will be applied in a fact specific inquiry. *Tahoe-Sierra Preservation Council,* 535 U.S. at 332, 342, 122 S. Ct. at 1484, 1489 (holding that the question of whether a 32-month moratorium on development while mandated land-use policies were adopted constituted a taking was not to be answered by any categorical rule, but, instead, by reliance on the familiar *Penn Central* approach); *Palazzolo*, 533 U.S. at 617, 121 S. Ct. at 2457. Where government regulation does not represent a total taking, such a case "necessarily entails complex factual assessments of the purposes and economic effects of government action." *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 234, 123 S. Ct. 1406, 1418 (2003); *Tahoe-Sierra Preservation Council*, 535 U.S. at 323, 122 S. Ct. at 1465; *Yee v. Escondido*, 503 U.S. 519, 523, 112 S. Ct. 1522 (1992).

Under *Penn Central*, regulatory takings claims require "ad hoc, factual inquiries" involving a balancing of the public and private interests involved in the particular case. The factors to be considered include (1) the economic impact of the regulation, (2) the degree to which the regulation

has interfered with the owner's reasonable "distinct investment-backed" expectations concerning the property, and (3) the character of the regulatory action. *Penn Central*, 438 U.S. at 124-25; 98 S. Ct. 2646. Other relevant factors may also be considered. The analysis, however, must focus on "the parcel as a whole." *Tahoe-Sierra Preservation Council*, 535 U.S. at 326-27, 122 S. Ct. at 1481; *Penn Central*, 438 U.S. at 130-131, 98 S. Ct. 2646. "[W]here an owner possesses a full 'bundle' of rights, the destruction of one 'strand' of the bundle is not a taking." *Tahoe-Sierra Preservation Council*, 535 U.S. at 327, 122 S. Ct. at 1481, quoting *Andrus v. Allard*, 444 U.S. 51, 65-66, 100 S. Ct. 318 (1979).

Thus, the Supreme Court's regulatory takings jurisprudence "is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Legal Foundation of Washington*, 538 U.S. at 233, 123 S. Ct. at 1417-18; *Tahoe-Sierra Preservation Council*, 535 U.S. at 323, 122 S. Ct. at 1465, quoting *Palazzolo*, 533 U.S. at 636, 121 S. Ct. at 2467 (O'Connor, J., concurring).

Additionally, even when something less than all economically viable use has been destroyed, or when the owner has not been denied all economically viable use of his land, government regulation may still constitute a taking if such regulation "does not substantially advance legitimate state interests." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 704, 119 S. Ct. 1624, 1636 (1999); *Agins v. Tiburon*, 447 U.S. 255, 260 (1980); *Dodd v. Hood River County*, 136 F.3d 1219, 1228 (9th Cir. 1998). Thus, land use regulation can effect a taking if such regulation does not substantially advance legitimate state interests or denies an owner economically viable use of his land. *Keystone Bituminous Coal Assoc. v. De Benedictis*, 480 U.S. 470, 485, 107 S. Ct. 1232 (1987) (reaffirming the *Agins* test).

Almost all of the Supreme Court's holdings on regulatory takings involve the adoption of ordinances, regulations, or other legislation that limit development or regulate land use. However, in at least one case the Court has found that other governmental regulatory activity constituted a taking. In *Del Monte Dunes*, 526 U.S. at 687, 119 S. Ct. at 1624, the Court considered actions by a local government, taken over five years, denying landowners permission to develop their property.

In that case, the landowners submitted their initial plan in 1981 in conformance with existing zoning and general planning requirements, proposing substantially fewer units than existing requirements would allow. The planning commission denied the application, but suggested that a proposal for a specified smaller number of units would receive favorable consideration. When the landowners submitted a revised proposal meeting those suggestions, the commission again denied the application and suggested an even greater reduction in the scale of the development, again stating a specific number of units. The landowners tried again, submitting a revised plan for the number of units suggested. The commission again denied the application. The landowners appealed to the city council, which overruled the commission and referred the plan back to the commission with instructions to consider a proposal for even fewer units.

The landowners once again reduced the number of units to be included in the development to comply with the council's instructions and submitted four specific, detailed site plans. The commission, nonetheless, again rejected the proposal. The city council again overruled the commission, "finding the proposal conceptually satisfactory and in conformance with the city's previous decisions regarding, *inter alia*, density, number of units, location on the property, and access." 526 U.S. at 696, 119 S. Ct. at 1632. The council approved one of the site plans, subject to specific conditions, and granted an 18-month conditional use permit for the development.

The landowners submitted a final plan addressing all the conditions specified by the city. The city's architectural review committee approved the plan, and the staff of the planning commission recommended approval of the plan as satisfying the city's conditions. The commission rejected the recommendation of its staff and denied approval of the development plan. The landowners again appealed to the city council which denied the final plan, declined to specify what other measures the landowners could take, and refused to extend the conditional use permit. The Supreme Court stated that the council did not base its decision on the landowners' failure to meet any of the specific conditions earlier required by the city, but made general findings as to the plan's inadequacies that were unsupported by the facts.

The jury found there was a taking based on jury instructions that it should find for the landowners if it found either that the landowners had been denied all economically viable use of its property or that the city's rejection of the plaintiff's development proposal did not substantially advance a legitimate public purpose. 526 U.S. at 700, 119 S. Ct. at 1634. There was sufficient evidence for the jury to conclude that the city's purported reasons for denying the development application were invalid and that the city unfairly intended to forestall any reasonable development of the property. 526 U.S. at 703, 119 S. Ct. at 1635.

The city's actions in *Del Monte Dunes* were described as shifting in the nature of the demands made and its final denial as inconsistent with its professional staff and its own previous decisions. 526 U.S. at 706, 119 S. Ct. at 1637. There was also proof that the city had long been interested in acquiring the property itself. *Id.*

In *Del Monte Dunes* the Court carefully distinguished the city's conduct in that case from other "routine regulatory decisions." 526 U.S. at 706-07; 119 S. Ct. at 1637. *See also Tahoe-Sierra Preservation Council*, 535 U.S. at 334, 122 S. Ct. at 1485 (distinguishing the diligent and good faith efforts of the board in that case from the "stalling" in *Del Monte Dunes*). Further, in *Palazzolo*, the Court cited *Del Monte Dunes* for the statement that, "Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." 533 U.S. at 621, 121 S. Ct. at 2460.

In fact, the Court has recognized that different questions arise "in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like. . . ." *See Tahoe-Sierra Preservation Council*, 535 U.S. at 329, 122 S. Ct. at 1482; *First English Evangelical Church*, 482 U.S. at 321, 107 S. Ct. at 2378. The Court has long recognized the police power of local

governments and has stated that such governments "may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate - - a reality [the Court] acknowledge[s] explicitly with respect to the full scope of the State's police power." *Lucas*, 505 U.S. at 1023, 112 S. Ct. at 2897.

The developer has not alleged a total regulatory taking, and cannot make such an allegation in view of the temporary nature of the denial of permits. Further, the developer has not shown that development or all economic use of the property was prevented. Although the developer has alleged that the refusal to grant further permits was arbitrary, it has not specifically alleged that the Commission's decision did not substantially advance governmental interests. The developer has not specifically refuted the Commission's proof that its denials were based on its interpretation of its regulations regarding the lapse of a preliminary plan after one year and the developer's refusal to submit a new preliminary plan. These facts certainly distinguish the Commission's acts here from those of the city in the *Del Monte Dunes* case. In addition, they are relevant to the developer's claim of arbitrariness and to any question of legitimate governmental interests.

While we have serious doubts about the developer's ability to establish the elements necessary to a compensable temporary taking, we nonetheless decline to decide that Mt. Juliet is entitled to judgment as a matter of substantive takings law based on the record before us. Additionally, we believe it is more likely the trial court's dismissal was based upon the city's statute of limitations argument. From their briefs, the parties share that interpretation.

## III. STATUTE OF LIMITATIONS

There is another requirement of takings law that is relevant to our discussion of the applicable statute of limitations. A taking of property for public use violates the Takings Clause only if just compensation is not paid. "The Fifth Amendment does not proscribe the taking of property, it proscribes taking without compensation." *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194, 105 S. Ct. 3108, 3120 (1985). If no compensation is due, there is no constitutional violation. *Legal Foundation of Washington*, 538 U.S. at 240, 123 S. Ct. at 1421.

Similarly, there is no constitutional violation if the government provides an adequate postdeprivation remedy for the property loss and just compensation is received. *Del Monte Dunes*, 526 U.S. at 714-15, 119 S. Ct. at 1641.

> The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. Nor does the Fifth Amendment require that just compensation be paid in advance of or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government'

-8-

for a taking. Thus, we have held that taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act, 28 U.S.C. § 1491. Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

*Williamson County*, 473 U.S. at 195, 105 S. Ct. at 3120-21 (citations omitted). The requirement that a landowner pursue state remedies for just compensation before bringing a claim based on violation of the Fifth Amendment is a ripeness requirement applicable to federal courts. *Id.* However, the Supreme Court's discussion of Tennessee procedures for seeking compensation for a regulatory taking is instructive, along with Tennessee holdings, in determining the appropriate statute of limitations.

In *Williamson County*, the Court found that the plaintiff's claim was not ripe for review because it had not sought just compensation pursuant to Tennessee law. The Court found that Tennessee's inverse condemnation statutes and procedures allowed recovery for a taking, including one "effected by restrictive zoning laws or development regulations," *i.e.*, a regulatory taking. *Id.*, 473 U.S. at 196, 105 S. Ct. at 3121-22. The Court held that because the plaintiff had not shown that the inverse condemnation procedure was unavailable or inadequate, its taking claim was premature until it had used those procedures to attempt to obtain just compensation. *Id.*, 473 U.S. at 197, 105 S. Ct. at 3122.

The Tennessee Supreme Court has interpreted the takings provision of the Tennessee Constitution[8] and the law of inverse condemnation consistently with the *Williamson County* holding. Article I, Section 21 of the Tennessee Constitution, the Tennessee takings clause, has been interpreted as recognizing the right of eminent domain, but also as a limitation on that right "by entirely prohibiting the taking of private property for private purposes, and by requiring just compensation when private property is taken for a public use."[9] *Jackson v. Metro. Knoxville Airport Auth.*, 922 S.W.2d 860, 861 (Tenn. 1996).

The Tennessee legislature has implemented this constitutional provision through adoption of eminent domain and inverse condemnation statutes. *Edwards v. Hallsdale-Powell Util. Dist.*, 115

---

[8]The Tennessee Constitution in Article I, Section 8 provides that "no man shall be . . . deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land." Article I, Section 21 provides that "no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives or without just compensation being made therefor." These provisions apply to governmental taking of property. *Barge v. Sadler*, 70 S.W.3d 683, 687 n.4 (Tenn. 2002); *Far Tower Sites, LLC v. Knox Co.*, 126 S.W.3d 52, 62-63 (Tenn. Ct. App. 2003); *Cross v. McCurry*, 859 S.W.2d 349, 353 (Tenn. Ct. App. 1993).

[9]The same view is taken of the Takings Clause of the United States Constitution: it affirms the government's authority to confiscate private property, but imposes two conditions: the taking must be for a public use, and just compensation must be paid. *Legal Foundation of Washington*, 538 U.S. at 231-32, 123 S. Ct. at 1417.

S.W.3d 461, 464 (Tenn. 2003); *Jackson*, 922 S.W.2d at 861. Both statutory procedures are methods by which a landowner can enforce the right to just compensation. Inverse condemnation "is a shorthand description of the manner in which a landowner recovers just compensation for a taking of property when condemnation proceedings have not been instituted." *Jackson*, 922 S.W.2d at 861-62.

Consequently, inverse condemnation is the method to be used to obtain just compensation, and the statute of limitations applicable to such actions is the appropriate statute to be applied in the lawsuit before us. That statute, Tennessee Code Annotated Section 29-16-124, requires landowners to "commence proceedings within twelve (12) months after the land has been actually taken possession of, and the work of the proposed internal improvement begun."

The developer argues that the trial court erred by ruling that the one-year statute of limitations for inverse condemnation was applicable to his complaint, because the wording of the statute implicates a different scenario than the one presented by this case. It is true that the language of the statute envisions a physical possession or intrusion upon the land rather than a regulatory action preventing use of the land. However, it is clear that inverse condemnation is the appropriate cause of action here and that the one year statute of limitations applicable to such actions is the correct statute to use. *See Pleasant View Util. Dist. v. Vradenburg,* 545 S.W.2d 733, 735 (Tenn. 1977) (holding that where an entity with the power of eminent domain "destroys, interrupts or interferes with the common and necessary use of real property of another. . . ." such action constitutes a "taking," and the inverse condemnation statute and its related limitations statute apply, even in cases where there is no actual entry upon the land). The question is not whether the one year statute applies, but, rather, when does the one year start running.

Under the statute, the triggering event for the running of the statute is the landowner's knowledge of the entry onto the land or the beginning of the improvement affecting the land and its use.[10] Similarly, the triggering event in a regulatory takings case is the date the landowner knew that the government was depriving it of the economic use of its property. In the case before us, that event occurred when the Commission denied the developer' application for further development and held that the developer was required to file for approval a new preliminary plat for the subdivision as a whole as a prerequisite to further development.

A thorough review of the record in the trial court shows that the developer's primary dispute with the Commission was the Commission's position that the original approval by Wilson County of the preliminary plat had lapsed and, consequently, the developer was required to submit a new

---

[10]In addition to the provision discussed earlier, Tenn. Code Ann. § 29-16-124 also provides exceptions indicating knowledge or at least attributable knowledge is the key: "saving, however, to unknown owners and nonresidents, twelve (12) months after actual knowledge of such occupation, not exceeding three (3) years, and saving to persons under the disabilities of infancy and unsoundness of mind, twelve (12) months after such disability is removed, but not exceeding ten (10) years."

preliminary plan. The developer took the position that it did not have to submit a new preliminary plan.[11]

The developer was aware of the Commission's interpretation and application of the ordinances and regulations to Park Glen in at least March of 1995 when the city informed the developer, affirming discussion at the March meeting of the Commission, of the requirement. In fact, the developer's complaint alleges that "from late 1995 or early 1996," the city denied permits for further development. In his deposition, Mr. Campbell indicated that he became aware of the alleged "taking" of his property right in late 1995 or early 1996.

The Commission's position was later reaffirmed in a meeting on January 15, 1998, where the developer appeared and stated its position that no new preliminary plan need be submitted for approval and the Commission adhered to its interpretation of the regulations.[12] Because the developer claims that the Commission's decision to require the developer to submit a new preliminary plan was the arbitrary and illegal action that prevented development, the time for the developer to file an action began to run, at the latest, on January 15, 1998.[13] This lawsuit was filed May 26, 1999, beyond the one year statute of limitations. Consequently, it is time barred and the trial court correctly granted the city's and the Commission's dispositive motions and dismissed the lawsuit.

On appeal, the developer argues that even if the one year inverse condemnation statute of limitations were applicable, the entire case should not have been dismissed because the denial of permits was an ongoing deprivation of the developer's full use of its property. Consequently, it argues, the city is still liable for a temporary taking from May 26, 1998, one year before the filing of the complaint, until June of 2001, when development was permitted. We disagree. The action by the Commission that prevented further development until the developer complied with the requirement of a new prelimary plat was clear, definitive, and final. This is not a situation, like in *Del Monte Dunes*, where the city kept changing the requirements and stalled on a final decision.

Once the Commission decided that approval of a new preliminary plat was required before any further development could be approved, the developer had a choice of action. It did not decide to file the required plat. It did not decide to seek judicial review of the merits of the Commission's

---

[11]Although the developer made some assertions below that the Commission sought to require it to comply with new subdivision regulations, no specific examples have been given. We interpret the assertions as referring to the requirement that the developer submit a new plat for preliminary approval that complied with Mt. Juliet subdivision regulations. Any difference between Mt Juliet regulations and Wilson County regulations existing at the time of the original preliminary approval has not been pointed out.

[12]The merits of the parties' respective interpretations of the regulations and their application to these facts is not before us.

[13]The developer's action in July 1998 in appearing before the Commission to reiterate its argument that no new preliminary plat was required did not re-start the running of the statute of limitations. The Commission had previously made a final ruling on the issue, and the landowner could not extend its time for bringing a takings action by making a renewed argument against that ruling.

interpretation.  Instead, it waited for more than a year and filed a lawsuit seeking to compel the Commission to issue permits and asking for damages for delay in the issuance of such permits.  It simply waited too long, and the action is time barred.

## IV. CONCLUSION

We affirm the trial court's dismissal of the action.  Costs of this appeal are taxed to the appellant, STS/BAC Joint Venture.

_____
PATRICIA J. COTTRELL, JUDGE